NICHOLS MOTORCYCLE SUPPLY
INC., an Illinois corporation,
Plaintiff,

v.

DUNLOP TIRE CORPORATION, a Delaware corporation, Ed Tucker Distributor, Inc. d/b/a Tucker–Rocky Distributing, a Texas corporation, and Lemans Corporation, a Wisconsin corporation, Defendants.

No. 93 C 5578.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 6, 1995.

Order Vacating Decision in Part
Pursuant to Settlement Sept. 18, 1995.

Joseph G. Bisceglia, James A. McKenna, Royce Richard Bedward, Steven P. Blonder, Jenner & Block, Chicago, IL, Richard P. Campbell, Campbell & DiVincenzo, Chicago, IL, Anthony S. DiVincenzo, Campbell & DiVincenzo, Chicago, IL, for Nichols Motorcycle Supply, Inc.

Kenneth Henry Hoch, Robert Thomas Joseph, Patrick John Kelly, David E. Lieberman, Sonnenschein, Nath & Rosenthal, Chicago, IL, for Dunlop Tire Corp.

Joseph E. Coughlin, Terrence Patrick Canade, Michael J. Gaertner, Lord, Bissell & Brook, Chicago, IL, for Ed Tucker Distributor, Inc.

Ethan Edward Trull, Alexander S. Vesselinovitch, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, David J. MacDougall, Brennan, Steil, Basting & MacDougall, Janesville, WI, for Lemans Corp.

## TABLE OF CONTENTS

I. The Facts ...................................................................................1097
 A. Nichols ................................................................................1097
 B. Dunlop ................................................................................1098
 C. Metzeler ..............................................................................1099
 D. Tucker/Rocky ..........................................................................1099
 E. Parts Unlimited .......................................................................1099
 F. Combined Market Share .................................................................1100
 G. The Economic Experts ..................................................................1100
II. The Antitrust Conspiracy Claims .........................................................1100
 A. The Sherman Act § 1 ...................................................................1100
 1. Count I: *Per Se* Violations .....................................................1101
 a. Legal Standards .........................................................1101
 b. The Plaintiff's Evidence ................................................1105
 (i) The Year 1991 ........................................................1105
 (ii) The Year 1992 .......................................................1105
 (iii) The Year 1993 ......................................................1107
 (iv) March 1993–June 15, 1993 ...........................................1108
 (a) March 15, 1993: Tucker/Rocky Article Quoting Bob Gregg (PX 382) ...................................................................1108
 (b) The March 22, 1993 Gregg Letter (PX 4C) ...........................1108
 (c) March 22, 1993: Parts Unlimited Revises Price List (PX 444) ........1109
 (d) March 31, 1993: Phone Call (PX 624) ...............................1110
 (e) Late March 1993: Mike Buckley Replaces Pat Logue as Dunlop's National Sales Manager ............................................1110
 (f) Late March 1993: Gregg Phone Call to Buckley Regarding Termination of Distributors ....................................................1110
 (g) April 1, 1993: Buckley Memo To Dunlop Distributors (PX 2) .........1110
 (h) The April 8, 1993 Gregg Letter (PX 5) .............................1110
 (i) April Phone Call Between Buckley & Gregg Regarding April 8, 1992 Gregg Letter ...............................................1111
 (j) April 30, 1993: Logue Conversation with Motorcycle Stuff Regarding Tucker/Rocky's Low Prices .....................................1111
 (k) May 6, 1993: Buckley Visits Nichols, Meets Jack Jesse, and Writes Call Reports (PX 14) ..............................................1111
 (*l*) May 6, 1993: Buckley Spends Evening with Jeff Fox of Parts Unlimited .........................................................1112
 (m) May 7, 1993: Buckley Visits Tucker/Rocky Warehouse in Chicago...1112
 (n) Early May 1993: "Firm Commitments" (PX 17) .....................1112
 (o) Late May 1993: Tucker/Rocky Issues Revised Price List (PX 214; PX 645) .........................................................1112
 (p) May 20, 1993: Buckley's "Price War" Memo (PX 3) .................1112
 (q) Buckley's Memos to Robin Mitchell (PX 17; PX 18) .................1113
 (r) June 15, 1993: Dunlop Terminates Nichols (PX 16) .................1114
 (v) Post–Termination Evidence .......................................1114
 (a) June 1993: Tucker/Rocky Branch Manager's Report (PX 277) ........1114
 (b) Joe Piazza (PX 540) .............................................1114
 (c) Tucker/Rocky's Missing Branch Manager Reports ...................1114
 (d) September 1993: Trade Show Memo (PX 206) .......................1114
 (e) Metzeler Memo of October 5, 1993 on "Price Stability" (PX 303)...1114
 (f) Tucker/Rocky Memo Regarding "Market Stabilizing Programs" (PX 280) .........................................................1115
 (g) Dunlop Raises MSD Mid–Year ....................................1115

 (h) Rick Ward (DX 36) ........................................... 1115
 (i) 1994 Price Increases ............................................. 1115
 (j) Tom Peterich ................................................. 1115
 (vi) Inadmissible Testimony ......................................... 1115
 (a) James Stewart ...................................... 1115
 (b) Rocky Trevino (PX 622) ......................................... 1116
 (c) Terry Baisley–William Giacomelli Conversation (PX 643) ........... 1116
 c. Analysis ........................................................ 1116
 (i) The Horizontal Agreement ...................................... 1117
 (ii) The Vertical Agreement ........................................ 1118
 (a) There is no evidence of parallelism supporting the inference of an agreement
 to terminate Nichols or to fix prices ................................ 1118
 (i) Market Theory .................................................. 1118
 (ii) Three Examples of Non–Parallel Behavior ............................. 1119
 (a) Dunlop Unilaterally Decided to Reduce Its Distribution Network... 1119
 (b) Parts Unlimited's 1993 Price Increases ............................ 1121
 (c) Tucker/Rocky and Parts Unlimited's 1994 Price Increases ........... 1122
 (b) The Gregg letters are ambiguous evidence and therefore do not support an
 inference of pricefixing or a termination agreement ........................... 1122
 (i) The March 22, 1993 Gregg Letter ................................... 1122
 (ii) The April 8, 1993 Gregg Letter ..................................... 1124
 (c) There is no other direct or circumstantial evidence of collusion supporting
 Nichols' section 1 claim ................................................ 1125
 2. Count II: The Rule of Reason ......................................... 1125
 a. Legal Standards ................................................ 1125
 b. Analysis ....................................................... 1126
 3. Count III: Group Boycott ............................................ 1128
B. The Illinois Antitrust Act ................................................ 1128
 1. Count IV: *Per Se* Pricefixing ........................................ 1128
 2. Count V: Rule of Reason ............................................. 1129
 3. Count VI: Group Boycott ............................................ 1129
C. The Robinson–Patman Act Claims ......................................... 1129
 1. The Facts ........................................................... 1129
 2. The Merits .......................................................... 1130
 a. Dunlop: Section 2(a) ............................................ 1130
 b. Tucker/Rocky and Parts Unlimited: Section 2(f) ...................... 1132
 3. The "Meeting Competition" Defense ................................... 1133
 a. Background ..................................................... 1134
 b. Analysis ....................................................... 1136
III. **The State Law Claims** ..................................................... 1138
 A. The Facts ............................................................. 1138
 B. Claims Against Dunlop ................................................. 1139
 1. Count VIII: Illinois Consumer Fraud Act ............................. 1139
 2. Counts IX & X: Illinois Franchise Act ............................... 1141
 3. Count XI: Promissory Estoppel ...................................... 1141
 4. Count XII: Equitable Estoppel ...................................... 1142
 5. Count XIII: Equitable Recoupment .................................. 1142
 6. Count XIV: Breach of Contract/Good Faith & Fair Dealing ............ 1143
 7. Count XV: Fraud .................................................. 1143
 C. Claims against Tucker/Rocky and Parts Unlimited ........................ 1144
 1. Count XVI: Tortious Interference with Contract ...................... 1144
 2. Count XVII: Tortious Interference with Prospective Economic Advantage ......... 1145
IV. **Dunlop's Motion to Strike Nichols' Jury Demand** ............................ 1146
V. **Conclusion** .............................................................. 1147

---

### MEMORANDUM OPINION AND ORDER [1]

CASTILLO, District Judge.

On June 15, 1993, after a thirty-year business relationship, Dunlop Tire Corporation ("Dunlop"), the largest manufacturer of motorcycle tires in the United States, terminated Nichols Motorcycle Supply Inc. ("Nichols"), its oldest distributor. The termination letter—commonly referred to in the vernacular as a "Dear John" letter—merely stated:

---

**1.** On August 1, 1995, following oral argument, the Court, in a minute order, granted summary judgment in favor of all defendants as to Counts

I–VI (1–6) of the Third Amended Complaint. The Court also granted Defendant Dunlop's Motion for Summary Judgment with respect to

Dear Jack:

Please see enclosed copy of your "Dunlop Distributor Motorcycle Tire/Tube Agreement" signed by you on January 11, 1993. In reference to item nine of above-mentioned agreement, Dunlop Tire Corporation exercises its option to terminate this agreement effective five days from receipt of this letter.

Regards,

DUNLOP TIRE CORPORATION

Mike Buckley

National Sales Manager

Motorcycle Tire Division

Not surprisingly, as a direct result of this letter, Nichols commenced a multi-faceted litigation campaign against Dunlop and other parties. Thus, currently pending before this Court is an antitrust action brought by Nichols against Dunlop and Dunlop's two largest distributors, Tucker/Rocky Distributing ("Tucker/Rocky") and LeMans Corporation, through its Parts Unlimited division ("Parts Unlimited"), Nichols' former competitors.[2] The Third Amended Complaint contains seventeen counts.[3] The federal antitrust conspiracy claims, brought under the Sherman Antitrust Act, 15 U.S.C. § 1 (1995), and the Clayton Act, as amended by the Robinson–

Patman Act, 15 U.S.C. § 13(a) (1995),[4] are asserted in Counts I–III and VII. The Illinois Antitrust Act claims are asserted in Counts IV–VI and the supplemental state law claims are asserted in Counts VIII–XVII. The Court has federal subject matter, supplemental and diversity jurisdiction. The fate of the state law claims depends largely upon the decisions this Court makes regarding the Sherman and Robinson–Patman Act claims. We will begin there.

### I. The Facts[5]

The relevant market for antitrust purposes in this case is defined as the manufacture, sale, distribution and resale of replacement and premium motorcycle tires in the United States. 12(N)(3)(b) Reply ¶ 5. The relevant manufacturers and distributors, for purposes of this case, are as follows.

### A. Nichols

Nichols is an Illinois corporation with its principal place of business in Alsip, Illinois. Nichols has been in the business of distributing motorcycle parts, accessories, supplies, and clothing since around 1960. 12(M) ¶ 1. Jack Jesse has been Nichols' president since

---

Counts IX through XIV (9–14) and Tucker/Rocky's and Parts Unlimited's Motion for Summary Judgment with respect to Counts VII, XVI, and XVII (7, 16 and 17) of the Plaintiff's Third Amended Complaint. The Court denied Defendant Dunlop's Motion for Summary Judgment with respect to Counts VII, VIII and XV (7, 8, and 15) of the Plaintiff's Third Amended Complaint. The Court further granted Plaintiff's Motion for Partial Summary Judgment on Defendant Dunlop's Section 2(b) affirmative defense to Count VII of Plaintiff's Third Amended Complaint, and denied Dunlop's Motion to Strike Plaintiff's jury demand. The minute order was intended to give the remaining parties sufficient time to prepare for trial. This Opinion is intended to provide reasons for those judgments. The entry of final judgment will be ordered on the date this Opinion is issued.

2. This lawsuit was originally assigned to Judge Conlon and transferred to this Court, by order of the Executive Committee, on May 13, 1995.

3. Count XVIII, alleging a civil conspiracy, was dismissed with prejudice by this Court on December 9, 1994.

4. The Robinson–Patman Act, 15 U.S.C. § 13 *et seq.*, is commonly referred to by its internal num-

bering as § 2 of the Clayton Act, and will be referred to as § 2 in this opinion.

5. The following facts are derived from the parties' Statements of Material (undisputed) Facts filed pursuant to Local Rules 12(M)–(N)(3)(b) of the United States District Court for the Northern District of Illinois. Some facts in this case will be more easily understood in context of the asserted claims and will be discussed in those portions of the Opinion. References to the undisputed facts, identified in the parties' Rule 12(M) statements and admitted by the non-moving party in the Rule 12(N) statement, will be designated "12(M) ¶ —." Factual disputes, when relevant, will be designated "12(N) ¶ —." Where additional facts supporting the denial of the summary judgment motion, as identified in the Rule 12(N)(3)(b) Statement, have been admitted by the moving party, those facts will be designated "12(N)(3)(b) ¶ —." Where certain facts are admitted and others denied, the admitted facts of the Rule 12(N)(3)(b) Statement of Additional Facts, will be designated "12(N)(3)(b) Reply ¶ —." The undisputed facts summarized in this opinion are those facts that appear to be "without substantial controversy" pursuant to Fed. R.Civ.P. 56(d). These facts should not be relitigated during trial.

the spring of 1993. 12(M) App. A. Terry Baisley has been Nichols' national sales manager since October 1989. *Id.* Ken Anderson is the marketing manager. *Id.* Nichols currently operates two warehouse distribution centers. Nichols' principal distribution center, which it has operated since approximately 1970, is in Alsip, Illinois (a Chicago suburb). In September 1992, Nichols acquired a second warehouse distribution center in Phoenix, Arizona. 12(M) ¶ 33. These warehouses currently remain open. *Id. See also* 12(N)(3)(b) Reply ¶ 67.

Nichols formerly distributed Dunlop tires and was Dunlop's oldest distributor, acting in this capacity for over 30 years before being terminated on June 15, 1993. 12(M) ¶¶ 146, 400. At the time Nichols was terminated, Dunlop tires constituted approximately 20 percent of Nichols' total sales. PX 608 at 29. Nichols has never distributed Metzeler products. 12(N)(3)(b) Reply ¶ 54. Nichols, however, does sell about 150 lines of motorcycle-related merchandise to both motorcycle retailers and approximately 15–20 different distributors. Nichols also currently sells the following tire brands: Bridgestone, Cheng Shin, Continental, Kenda, and Kings. 12(M) ¶ 2. In the past Nichols has also sold Dunlop, Avon, Michelin, Pirelli, and Yokohama. Nichols is also the owner of the Pro Sport line of motorcycle products and the exclusive agent for Kings motorcycle tires in continental North America. Nichols sells Pro Sport products and Kings tires through a network of distributors and publishes an annual catalog of suggested resale prices. 12(M) ¶¶ 12, 48.

Nichols' market share for Dunlop tires between 1990–1994, as indicated by the percentage of tires Dunlop sold to Nichols, was as follows:

Table 6. Dunlop Motorcycle Tire Sales to Select Distributors, 1990–94 (Percent)

| | 1990 | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|---|
| Nichols | 13.2 | 5.4 | 9.3 | 1.9 | 0.0 |

12(N)(3)(b) ¶ 12.[6]

6. Defendants have admitted, solely for summary judgment purposes, the assertions of Nichols' expert regarding percentage of sales of various motorcycle tire brands in certain markets because they believe that these assertions are immaterial to the Court's inquiry into whether the parties agreed to fix prices. The relevant expert data is contained in Plaintiff's Exhibit ("PX") 608 at 19.

## B. Dunlop

Dunlop is a Delaware corporation with its principal place of business in West Amherst, New York. 12(M) ¶ 4. Dunlop manufactures motorcycle tires and sells them to wholesale distributors, who resell them to retail dealers and subdistributors. Retail dealers in turn sell Dunlop tires primarily to the consuming public. *Id.* Robin Mitchell is Dunlop's senior vice president of marketing and sales. 12(M) App. A. Patrick Logue was Dunlop's national sales manager from approximately 1987 through March 1993. *Id.* Michael J. Buckley succeeded Mr. Logue as the national sales manager in March 1993. *Id.*

Dunlop is the largest selling motorcycle tire manufacturer in the United States. Its current market share in the relevant markets is approximately 62–70 percent. 12(M) ¶ 6. Dunlop's success can be partially attributed to the fact that Dunlop has very high consumer name recognition, which predisposes many consumers to purchase Dunlop replacement motorcycle tires. 12(N)(3)(b) Reply ¶ 7. Dunlop tires are also used by distributors as a lead product to generate sales of other non-Dunlop products to dealers. 12(N)(3)(b) Reply ¶ 8.

At the time Nichols was terminated as a Dunlop distributor in June 1993, Dunlop sold tires to 18 distributors: American Honda, Bell Industries, Custom Chrome, Cycle Products, Cycle Sports (in Puerto Rico), Dixie, Harley–Davidson, Intrac, J & D Walter, KK Motorcycle, Marshall Distributing, Motorcycle Stuff, Parts Unlimited, Performance Tire, Pikes Peak, Tucker/Rocky, and Tri–State. Of these 18 distributors, Dunlop sold the most tires to the following four distributors between 1990–1993 (in decreasing order): Tucker/Rocky, Parts Unlimited, Motorcycle Stuff, and Nichols Supply. 12(M) ¶ 10. Dunlop's top three distributors, measured by the percentage of tires sold to them from 1990–1994, are: Tucker/Rocky, followed closely by Parts Unlimited (within 2–5%),

and Motorcycle Stuff (7–9% off the leader from 1990–92; 21% off the leader in 1993; 12.4% off the leader in 1994; and 12.2% off the leader for all four years). *Id.* (PX 608, App. Table D–3). Nichols followed in fourth and fifth [7] place from 1990–1992, until its termination on June 15, 1993. *Id.*

### C. Metzeler

Metzeler is a German tire manufacturer, owned by Pirelli. Metzeler Motorcycle Tire North America is its North American subsidiary. 12(M) ¶¶ 7–8. Gregory Blackwell has been the president of Metzeler N.A. since January 1992. 12(M) App. A.

Metzeler is the second largest selling motorcycle tire manufacturer in the relevant market. 12(N)(3)(b) Reply ¶ 9. Metzeler tires generally sell at a higher price than Dunlop, and are not discounted as much because there is less intrabrand competition (*i.e.*, fewer distributors) for Metzeler tires. 12(N)(3)(b) Reply ¶ 13. In the last several years, Metzeler has reduced its distributor base from approximately 12 distributors to five. 12(N)(3)(b) Reply ¶ 14. Metzeler's five U.S. distributors are: KK Motorcycle, Motorace, Parts Unlimited, Pike's Peak and Tucker/Rocky. 12(M) ¶ 10. Tucker/Rocky and Parts Unlimited sell the largest numbers of Metzeler tires; together they account for 90 percent of its sales (Tucker/Rocky buys 60% and Parts Unlimited buys 30%). 12(N)(3)(b) Reply ¶ 14.

In 1990, Metzeler had a market share in the relevant markets of 24–30 percent. The president of Metzeler N.A., Gregory Blackwell, estimates that Metzeler's market share is currently 25–30 percent. However, Dunlop's reports indicate that Metzeler's total market share for tires fell to about 12.8–13.75 percent in 1993, although its share of the premium tire market may have been 15 percent. 12(N)(3)(b) Reply ¶ 10 (PX 608 at 16–18).

### D. Tucker/Rocky

Tucker/Rocky is a Texas corporation with its principal place of business in Irving, Tex-

as (Dallas). 12(M) ¶ 5. Robert Nickell is the current chairman and past president (October 1989 to October 1992). Robert Gregg succeeded Mr. Nickell as president on October 1, 1992. 12(M) App. A. Tucker/Rocky owns and operates 12 warehouses in the United States and is considered a national distributor. Tucker/Rocky is in the business of distributing parts, accessories, and apparel for motorcycles and watercraft. 12(M) ¶ 5. Tucker/Rocky is Dunlop's largest distributor, as indicated by its market share. 12(N)(3)(b) Reply ¶ 12. This market share is based on the percentage of tires Dunlop sold to Tucker/Rocky during the periods 1990–1994, and was as follows:

Table 6. Dunlop Motorcycle Tire Sales to Select Distributors, 1990–94 (Percent)

| Tucker/Rocky | 1990 | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|---|
| | 25.2 | 27.5 | 27.2 | 36.4 | 33.3 |

12(N)(3)(b) Reply ¶ 12.

### E. Parts Unlimited

LeMans Corporation is a Wisconsin corporation with its principal place of business in Janesville, Wisconsin. 12(M) ¶ 6. Fred Fox is the current chairman and chief executive officer. Jeff Fox is Fred Fox's son, and has been the president of Parts Unlimited since approximately October 1992. 12(M) App. A. LeMans, through its Parts Unlimited division, is in the business of distributing parts and accessories for motorcycles, watercraft, and snowmobiles. 12(M) ¶ 6. Parts Unlimited is Dunlop's second largest distributor, as indicated by its Dunlop market share. 12(N)(3)(b) Reply ¶ 12. This market share is based on the percentage of tires Dunlop sold to Parts Unlimited during the period 1990–1994, and was as follows:

Table 6. Dunlop Motorcycle Tire Sales to Select Distributors, 1990–94 (Percent)

| Parts Unlimited | 1990 | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|---|
| | 19.0 | 23.6 | 24.7 | 31.5 | 28.0 |

---

7. Nichols was beaten by Bell Industries in 1991, in terms of Dunlop distributor purchases, by .9 percent. This was the only year between 1990 and 1992 that Nichols did not finish fourth. *See* PX 608, App. Table D–3.

12(N)(3)(b) Reply ¶ 12. Plaintiff's expert concedes that Parts Unlimited, by itself, does not possess market power. *Id.*

### F. Combined Market Share

For the years 1990–1994, Tucker/Rocky and Parts Unlimited, combined, held the following market share:

Table 6. Dunlop Motorcycle Tire Sales to Select Distributors, 1990–94 (Percent)

| T/R & PU | 1990 | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|---|
| Subtotal | 44.2 | 51.1 | 51.9 | 67.9 | 61.4 |

12(N)(3)(b) Reply ¶ 12. This data establishes that Tucker/Rocky and Parts Unlimited's combined market share at the *end* of 1993 rose by 16 percent, dropping off in 1994, but remaining 9.5 percent higher than their combined 1992 market share. The combined market share of Dunlop and Metzeler is currently about 85 percent. 12(N)(3)(b) Reply ¶ 11.

### G. The Economic Experts

Nichols has retained an economist, Dr John Pisarkiewicz, as an expert to perform several tasks in this litigation. 12(M) ¶¶ 21, 196. Raymond S. Sims is a Vice President at A.T. Kearney, Inc., in Chicago, Illinois. He has been retained as an expert in this case by Dunlop. 12(M) ¶ 201. The defendants also offer Professor David T. Sheffman, who has produced a report entitled "Trends in the Motorcycle Industry 1985–1993," which indicates that the number of motorcycle dealers selling motorcycles and other related products dropped from 12,953 to 9,264 from 1985 to 1993. The number of real dollars (per million) from these sales, according to this report, also dropped from $1,671 to $1,247 during that time period. DX 70.

## II. The Antitrust Conspiracy Claims

### A. The Sherman Act § 1

In Counts I, II and III, plaintiff broadly alleges that the defendants unreasonably restrained trade by forming an illegal conspiracy to terminate smaller discounting distributors, like Nichols, to consolidate the market and implement an agreement to raise and stabilize resale dealer prices for Dunlop tires in violation of section 1 of the Sherman Antitrust Act. 12(N)(3)(b) ¶ 12.[8] In particular, Nichols claims that Dunlop, Tucker/Rocky and Parts Unlimited formed vertical and horizontal combinations.[9]

Section 1 states: "Every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal." 15 U.S.C. § 1 (1995). According to the statute, a plaintiff claiming a section 1 violation must establish a combination or some form of concerted action between at least two legally distinct economic entities. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771, 104 S.Ct. 2731, 2741, 81 L.Ed.2d 628 (1984). Under well-established principles of antitrust law, unilateral conduct ("independent action") by a single person or enterprise falls outside the scope of this provision. *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984) (citing *United States v. Colgate*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919)).[10] Whether an unlawful conspiracy or combination exists should be judged by what the parties actually did rather than by the words they used. *See United States v. Parke, Davis & Co.*, 362 U.S. 29, 44, 80 S.Ct. 503, 511, 4 L.Ed.2d 505 (1960) (citing *Eastern States Retail Lumber Dealers' Ass'n v. United States*, 234 U.S. 600, 612, 34 S.Ct. 951, 954, 58 L.Ed. 1490 (1914); *see also United*

---

8. Defendants admit only that Dunlop terminated Nichols as a distributor. Defendants do not concede that the record supports Nichols' theory of concerted activity to consolidate market share and to fix prices.

9. Restraints imposed by agreement between competitors have traditionally been labelled horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints; thus the nature of a restraint is determined by the type of agreement

that gives rise to the restraint rather than the anticompetitive economic effects of the restraint. *See Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 n. 4, 108 S.Ct. 1515, 1523 n. 4, 99 L.Ed.2d 808 (1988).

10. Under the *Colgate* doctrine, "independent action is not proscribed. A manufacturer of course has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Id.*

*States v. General Motors Corp.*, 384 U.S. 127, 142, 86 S.Ct. 1321, 1329, 16 L.Ed.2d 415 (1966) (holding explicit agreement is not a necessary part of a Sherman Act conspiracy where joint and collaborative effort is pervasive). Once a plaintiff establishes the existence of an illegal contract, combination or conspiracy ("an agreement"), it must then proceed to demonstrate that the agreement constituted an unreasonable (and therefore illegal) restraint of trade under either the *per se* rule or the rule of reason. The nature of the restraint (*e.g.*, vertical price restraint, vertical nonprice restraint, horizontal price restraint etc.) determines which rule must be applied. *See Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir.1993). The *per se* claims will be addressed first.

## 1. Count I: *Per Se* Violations

In Count I, plaintiff alleges that the defendants participated in a vertical and a horizontal conspiracy to fix prices in violation of section 1 of the Sherman Act. The plaintiff's theory in Count I is that these agreements were illegal *per se*. In particular, plaintiff's theory is that Dunlop, together with its two largest distributors, Tucker/Rocky and Parts Unlimited, conspired to terminate smaller discounting distributors, like Nichols, to consolidate their market share and implement an illegal agreement to raise and stabilize resale dealer prices for Dunlop motorcycle tires. There are two agreements under this theory: an agreement to terminate Nichols (because it was a discounter) and an agreement to fix prices. Plaintiff defines these agreements as both horizontal (between the two defendant distributors) and vertical (between Dunlop, Tucker/Rocky and Parts Unlimited) and admits that the proof of these conspiracies "tends to blend together." Transcript at 26. A review of the plaintiff's proof follows a short discussion of the applicable legal principles.

### a. Legal Standards

Conduct considered illegal *per se* is limited to cases where a defendant's actions are so plainly harmful to competition, *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 724, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988), that they are presumed illegal and the need for further proof of anticompetitive impact is unnecessary.[11] *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). *Per se* cases include horizontal and vertical pricefixing agreements and certain types of group boycotts. *See Capital Imaging v. Mohawk Val-*

---

**11.** The *per se* presumption simply eliminates the plaintiff's burden of proving anticompetitive impact to the finder of fact through market analysis by an expert economist, as required under the rule of reason; it does not eliminate the need to find antitrust injury, nor does it relieve the plaintiff of its burden to identify and articulate the precise anticompetitive impact caused by the *per se* pricefixing violation. An antitrust injury flows from pricefixing agreements which plainly reduce competition. However, some pricefixing agreements do not "restrain trade" and are therefore reasonable. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339–40, 110 S.Ct. 1884, 1891–92, 109 L.Ed.2d 333 (1990). It is important to note, however, that "[t]he antitrust laws were enacted for 'the protection of competition,' not *competitors.*'" *Id.* at 338, 110 S.Ct. at 1891 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)). Thus, a competitor "may not complain of conspiracies that set minimum [or maximum] prices at any level." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585, n. 8, 106 S.Ct. 1348, 1355 n. 8, 89 L.Ed.2d 538 (1986) (minimum prices); *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) (maximum prices), unless the dangers identified by *Albrecht* are present (*i.e.*, the smaller competitor is eliminated from competition pursuant to the price agreement and distribution is then channelled "through a few large or specifically advantaged dealers."). *Atlantic Richfield*, 495 U.S. at 328–29, 110 S.Ct. at 1886. Therefore, finding an agreement is only the first step; the agreement is not illegal under § 1 of the Sherman Act unless the nature of the pricefixing agreement reduces competition and injures dealers or consumers. *Id.* The Court must therefore carefully scrutinize the competitive effect of the pricefixing agreement alleged to be illegal *per se*. Because the presumption of injury eliminates the need for a plaintiff to produce an economist, this theoretical hurdle is now a question of law for the court on summary judgment. This Court is extremely cognizant of this important distinction, recently recognized by the Seventh Circuit in *Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.*, 61 F.3d 1250, 1257 (7th Cir.1995) (Easterbrook, J.) ("the antitrust injury doctrine applies with full vigor to the *per se* offenses").

ley Medical Assoc., 996 F.2d 537, 542–43 (2d Cir.1993) (listing the types of *per se* violations recognized by the Supreme Court). Pricefixing agreements need not include an "explicit agreement on prices to be charged or that one party have the right to be consulted about the other's prices." *Denny's Marina, Inc. v. Renfro Productions, Inc.*, 8 F.3d 1217, 1221 (7th Cir.1993) (citing cases). Rather, pricefixing agreements need only have been formed for the *purpose and effect* of fixing or stabilizing the price of a product in interstate commerce.[12] *Id.* Tacit agreements are therefore actionable if they can be shown to exist. 6 P. Areeda, *Antitrust Law* § 1410 at 66 (1986).

An agreement that is illegal *per se* under section 1 is difficult to prove. Much like Title VII cases, the antitrust analysis proceeds in stages because it involves shifting burdens that lead to an ultimate burden of proof which is extremely difficult for a plaintiff to satisfy.[13] *Market Force Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1171 (7th Cir.1990). The Seventh Circuit has articulated a burden shifting formula: "[w]hen the defendants establish that their conduct is consistent with independent action, the plaintiffs are required to come forward with evidence tending to exclude the possibility of independent action." *Id.* If the plaintiff's evidence of a conspiracy is ambiguous, (*i.e.*, is as consistent with the defendant's permissible independent interests, then the case may not proceed to a jury). *Id.* Conversely, the case may proceed if the plaintiff can demonstrate, through specific evidence, that the "inference of conspiracy to fix prices is reasonable in light of the competing inference of independent action." *Id.* at 1171 (quoting *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 660–61 (7th Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987)).

These Seventh Circuit standards have been derived from the specific standards set out by the Supreme Court in *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1983). In *Matsushita*, the Supreme Court granted certiorari to articulate the standard that district courts must apply when deciding a motion for summary judgment in an antitrust conspiracy case. In *Monsanto*, the Court granted certiorari to articulate the standard of proof required to find a vertical pricefixing conspiracy in violation of section 1 of the Sherman Act. These two cases establish the legal parameters for this Court's decision.

In *Monsanto*, Justice Powell, writing for the Supreme Court, found that the plaintiff presented sufficient evidence of an agreement to terminate a distributor, pursuant to a vertical pricefixing conspiracy between a manufacturer and a large distributor, to create a jury issue. In reaching this conclusion, the Court articulated the proper standard to be applied to section 1 claims like the one before us. The Court also outlined several important distinctions that are worth repeating here because they address the very heart of this case:

This Court has drawn two important distinctions that are at the center of this and any other distributor-termination case. *First, there is the basic distinction between concerted and independent action— a distinction not always clearly drawn by the parties and the courts.* Section 1 of the Sherman Act requires that there be a "contract, combination ... or conspiracy" between the manufacturer and other distributors in order to establish a violation. 15 U.S.C. § 1. Independent action is not proscribed. A manufacturer of course generally has a right to deal, or refuse to

---

**12.** An agreement to terminate a distributor without evidence of a related agreement on price is not sufficient to establish a *per se* violation. However, an agreement to terminate, if proven to have an anticompetitive impact, could be illegal under the rule of reason as a nonprice restraint. *See Business Electronics*, 485 U.S. at 724, 726, 108 S.Ct. at 1519, 1520. Nonprice restraints are not alleged in this case.

**13.** Unlike Title VII cases, however, the Plaintiff cannot prove an agreement to conspire merely by showing that the defendants' assertions of independent conduct were a pretext for pricefixing and illegal termination agreements.

deal, with whomever it likes, as long as it does so independently. *United States v. Colgate & Co.*, 250 U.S. 300, 307 [39 S.Ct. 465, 468, 63 L.Ed. 992] (1919); *cf. United States v. Parke, Davis & Co.*, 362 U.S. 29 [80 S.Ct. 503, 4 L.Ed.2d 505] (1960). Under *Colgate*, the manufacturer can announce its resale prices in advance and refuse to deal with those who fail to comply. And a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination. The second important distinction in distributor-termination cases is that between concerted action to set prices and concerted action on nonprice restrictions. The former have been *per se* illegal since the early years of national antitrust enforcement. *See Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 404–409 [31 S.Ct. 376, 383–385, 55 L.Ed. 502] (1911). The latter are judged under the rule of reason, which requires a weighing of the relevant circumstances of a case to decide whether a restrictive practice constitutes an unreasonable restraint on competition. *See Continental T.V. Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 [97 S.Ct. 2549, 53 L.Ed.2d 568] (1977).

While these distinctions in theory are reasonably clear, often they are difficult to apply in practice. In *Sylvania* we emphasized that the legality of arguably anticompetitive conduct should be primarily judged by its "market impact." But the economic effect of all the conduct described above—unilateral and concerted vertical price-setting, agreements on price and nonprice restrictions—is in many, but not all, cases similar or identical. [citation omitted]. And judged from a distance, the conduct of the parties in the various situations can be indistinguishable. For example, the fact that a manufacturer and its distributors are in constant communication about prices and marketing strategy does not alone show that the distributors are not making independent pricing decisions. A manufacturer and its distributors have legitimate reasons to exchange information about prices and the reception of their products in the market. Moreover, it is precisely in cases in which the manufacturer attempts to further a particular marketing strategy by means of agreements on often costly nonprice restrictions that it will have the most interest in the distributors' resale prices. *The manufacturer often will want to ensure that its distributors earn sufficient profit to pay for programs such as hiring and training additional salesmen or demonstrating the technical features of the product,* and will want to see that "free-riders" do not interfere. *Thus, the manufacturer's strongly felt concern about resale prices does not necessarily mean that it has done more than the Colgate doctrine allows.* Nevertheless, it is of considerable importance that independent action by the manufacturer, and concerted action on nonprice restrictions, be distinguished from price-fixing agreements, since under present law the latter are subject to per se treatment and treble damages. On a claim of concerted price-fixing, the antitrust plaintiff must present evidence sufficient to carry its burden of proving that there was such an agreement. If an inference of such an agreement may be drawn from highly ambiguous evidence, there is a considerable danger that the doctrines enunciated in *Sylvania* and *Colgate* will be seriously eroded.

*Monsanto*, 465 U.S. at 760–63, 104 S.Ct. at 1464–70 (emphasis added). The Supreme Court then held that evidence that is sufficient to show agreement is evidence that "tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." 465 U.S. at 764, 104 S.Ct. at 1471.[14]

14. In a footnote, the Court explained:

The concept of a meeting of the minds or a common scheme [to fix prices] in a distributor termination case includes more than a showing that the [nonterminated] distributor conformed to the [manufacturer's] suggested resale price. It means ... that evidence must be presented [by the plaintiff that shows] that the distributor [not only] communicated its acquiescence or agreement, [but] that this [acquiescence] was [also] sought by the manufacturer. *Monsanto*, 465 U.S. at 761 n. 9, 104 S.Ct. at 1471 n. 9.

In *Matsushita*, the Court found that the defendants lacked an economically plausible motive to conspire and thus concluded that there was no genuine issue for trial. On the issue of motive, Justice Powell, again writing for the Court, found:

> the absence of plausible motive to engage in the conduct charged is highly relevant to whether a genuine issue for trial exists within the meaning of Rule 56(e). Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy.

475 U.S. at 596, 106 S.Ct. at 1361. To summarize, *Monsanto* requires the plaintiff to produce evidence that tends to preclude independent action. *Matsushita* limits the range of justifiable inferences that can be drawn from ambiguous evidence offered to comply with *Monsanto*.

■ Direct evidence of a conspiracy will always meet this standard. "Ambiguous" circumstantial evidence, alone, will not be enough. Somewhere between these two extremes lies the kind of circumstantial evidence that will provide enough direction for the factfinder to conclude that the defendants' minds met, and from this meeting an agreement arose and was implemented through concerted action that achieves an unlawful objective. *Monsanto*, 465 U.S. at 761 n. 9, 104 S.Ct. at 1471 n. 9. The demarcation between circumstantial evidence which is "ambiguous" and that which is not, however, is unclear.

Ambiguous evidence permits equally competing inferences without "tending" to point in one direction or the other. *Market Force*, 906 F.2d at 1171. For example, circumstantial evidence of a conspiracy that is "consis-

tent with independent action" is ambiguous. *Monsanto*, 465 U.S. at 763, 104 S.Ct. at 1470. Ambiguous evidence cannot be sent to a jury because a court may not invite the factfinder to speculate that an agreement existed. *See* 6 P. Areeda, *Antitrust Law* § 1405 at 21–23, for a good discussion of the judge and jury's role in determining whether an agreement exists. To prevent such speculation, the Supreme Court has held that "the range of [permissible] inferences that may be drawn from ambiguous evidence [must be] limited," *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Capital Imaging v. Mohawk Valley Medical Assoc.*, 996 F.2d 537, 542 (2d Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 660–61 (7th Cir.1987), and cannot be used, without more, to establish the existence of a section 1 agreement.

Conversely, unambiguous evidence tends to point in a single direction—like a signpost.[15] The Supreme Court has defined the absence of ambiguity as evidence which "tends to exclude the possibility" that the defendants acted independently for lawful business reasons, rather than in concert for unlawful purposes. *Monsanto*, 465 U.S. at 761, 104 S.Ct. at 1469. As Professor Areeda says:

> Notwithstanding many difficulties in appraising the sufficiency of circumstantial evidence, we know what we are looking for: some level of commitment to a common course of action. The fact-finder may be perplexed by the evidence, but his reasoning will not be confused if he keeps clearly in mind that he is looking for a traditional agreement.
>
> The analytical problem is that there is a "no man's land" between the traditional agreement and tacit coordination through recognized interdependence. The line be-

---

15. As a practical matter, it may be difficult to draw a distinction between direct and unambiguous circumstantial evidence, since the characterization depends upon the facts of an individual case. *Cf.* 6 Areeda, *Antitrust Law* § 1410 at 64 ("[D]irect evidence [of an agreement includes] such [things] as ·documents, meetings, and participant testimony that defendants exchanged

commitments or otherwise collaborated by some means other than making a marketplace decision."). In this case, the documents and testimony that will be reviewed do not manifest an agreement that is so obvious that the Court need not pause in reaching a decision under Section 1. Quite the contrary, the evidence in this case never exceeds the outer limit of ambiguity.

tween lawful interdependent behavior and unlawful commitment is not sharp. The former can often blend into the latter, because reciprocal assurances can be communicated by conduct rather than be words and remain "agreements" even though vague, incomplete, and riddled with qualifications and exceptions.

*Id.* § 1410 at 67. The crucial question is: "Who was in agreement with whom and about what?" *Id.* § 1409 at 59.

#### b. The Plaintiff's Evidence

What follows is the evidence that the plaintiff has relied upon in an attempt to meet the requirements of *Monsanto* and *Matsushita* and to survive the defendants' Motions for Summary Judgment.[16] It is summarized in a chronological fashion to give the reader a comprehensive view of the evidence plaintiff discovered to prove its case and which this Court evaluated in reaching its decisions.[17]

#### (i) The Year 1991

In August of 1991, Tucker/Rocky, the largest distributor for Dunlop tires in the United States, attempted to purchase Nichols' business, which then consisted of just one warehouse located in Alsip, Illinois, a suburb of Chicago. Tucker/Rocky threatened to open its own warehouse in Chicago if Nichols declined to sell. Nichols declined to pursue negotiations with Tucker/Rocky. 12(N)(3)(b) Reply ¶ 17. Tucker/Rocky then made good on its threat, opening its own Chicago warehouse (its 12th location) in August 1992. In May 1992, Nichols began planning to open a Phoenix, Arizona warehouse.

In the meantime, a price war among distributors had developed regarding the sale of Dunlop tires.[18] For instance, in September of 1991, Tucker/Rocky's monthly reports indicate that its Dunlop sales were dropping due to "deteriorating service level and competitive pressure." PX 252U. Reports in the following months bore the same complaints. An October 1991 report noted the existence of "[s]evere price pressure on Dunlop." PX 251. A December 1991 report referred to "[a]nother 25% drop in Dunlop sales over the previous month.... Discounting by the competition has to be a big factor." PX 250U.

Despite its one-warehouse operation, the evidence indicates that Nichols successfully used discounting methods to undercut Tucker/Rocky and Parts Unlimited in areas of the country where these large distributors were strongest. There is also deposition testimony that Tucker/Rocky was "unwilling to sell" at Nichols' prices and that Jeff Fox of Parts Unlimited discussed the need to "clean up the market" with Pat Logue of Dunlop.

#### (ii) The Year 1992

In January 1992, Tucker/Rocky's monthly reports indicated that "[i]f profits fell in 1991, [Dunlop] was probably to blame." PX 249U. In April 1992, Tucker/Rocky indicated that it was concerned about maintaining a "decent [profit] margin." PX 228. By November 1992, Bob Gregg found it necessary to send a memo to Tucker/Rocky's sales representatives to pass the word that "[d]ealers should resent deals that are too low" and should "[t]ell the opportunist distributor that the path to long term success is not short term deep discounts that actually *hurt* the dealer. Rather, if they want the business they must

---

**16.** References to the Exhibits submitted in this case are as follows: Defendants' Joint Exhibits are marked "DX—"; Plaintiff's Exhibits are marked "PX—." Deposition testimony is designated by name and page number.

**17.** The Court has attempted to summarize the Plaintiff's most relevant evidence. The fact that every single piece of Plaintiff's evidence is not contained in this summary does not mean that the evidence was not evaluated by this Court. The Court has fully evaluated all the evidence cited by the Plaintiff in deciding the motions addressed in this Opinion and has followed the urging of *Big Apple BMW, Inc. v. BMW of No.*

*Am.,* 974 F.2d 1358, 1364 (3d Cir.1992), to view the evidence as a whole.

**18.** This price war consisted of aggressive price discounting by Dunlop distributors to dealers nationwide. Dunlop discounting was particularly fierce in southern California, which was an important market for motorcycle tires. 12(N)(3)(b) ¶ 20 (citing PX 601 a Dunlop Memorandum identifying Arizona (Phoenix, Scottsdale, Mesa, and Chandler); California (Los Angeles and San Jose); and Illinois (Chicago) as "key" markets). Southern California was a stronghold for Parts Unlimited. PX 6.

earn it through market *stabilizing* programs, service and support that *helps* a dealer short and long term." PX 280 (emphasis in original). Gregg also noted that dealers "should not switch orders from an industry supporter like Tucker/Rocky to an opportunistic offer." *Id.*

During the summer and fall of 1992, various meetings took place between Dunlop, Nichols, Tucker/Rocky and Parts Unlimited. For instance, in July or August 1992, Pat Logue of Dunlop met with Jack Jesse, the president of Nichols. Nichols did not mention the new warehouse at that time. On August 16, 1992, Logue attended Tucker/Rocky's open house for its new Chicago warehouse. On August 17, 1992, Logue held a business meeting with Jeff Fox of Parts Unlimited. On September 14, 1992, Nichols leased the new Phoenix warehouse. Later that month, at the IMAE trade show in Las Vegas, Nevada, Jesse told Logue that Nichols planned to open a new warehouse in Phoenix. In October 1992, Logue flew to Dallas to hold business meetings with Bob Nickell, the current chairman and past-president of Tucker/Rocky, and Bob Gregg, the president of Tucker/Rocky since October 1, 1992. In November of 1992, Nickell spoke with Jeff Fox of Parts Unlimited at a Dunlop distributor meeting in Hawaii. Fox recalled discussing only non-business matters with Nickell in Hawaii.

On November 14, 1992, Lee Walsh, a Parts Unlimited representative, wrote a letter to Jeff Fox, which stated:

Nichols Motorcycle supply has recently hired 2 Road Reps for this area. One in Washington and One in Oregon. While in Oregon this week I got my hands on the discount program that they are proposing to the dealers. (copy enclosed). I also did a price compare spread sheet so we could see where we stood (copy enclosed).

The pricing is bad enough, but they are also talking up the new Phoenix warehouse and are telling the dealers that they are looking to expand their warehouse locations and that Seattle is one of the target areas!!

This is probably a big line of bull—but the dealers are sure listening.

I'm not concerned, but I thought you ought to know and should see how the pricing actually ends up.

Please show this to Jet.

Thanks,
Jeff

PX 22.

On December 28, 1992, Pat Logue, the National Sales Manager for Dunlop, issued the following Memorandum to all of Dunlop's distributors:

To: All Dunlop Motorcycle Tire Distributors

From: P.J. Logue

Date: December 28, 1992

Subject: 1993 Dunlop Distributor Motorcycle Tire/Tube Agreement

As we move into 1993, it is important that you understand Dunlop's plans for the tire replacement market is not going to grow in the predictable future. Our distributor base is still at approximately the same level as it was when the market was 35% larger than it is today.

Because of this situation, it is our intention to reduce our account base before the September IMAE by at least two to three distributors. This is a very difficult decision but it is still one that must be made. In addition, anyone involved in sub-distribution will be cancelled. Clearly if we are concerned about the size of our existing direct distributor base, it would only make sense that "unapproved" sub-distribution base must be eliminated first.

You are encouraged to read the entire Motorcycle Tire/Tube Agreement. In particular, read point number 3. The channel of distribution that Dunlop will support and approve is detailed in this section.

Please return the signed agreement by January 8, 1993. After January 8th, all shipments will cease to distributors that have not returned agreements.

Thank you for both your understanding and cooperation. Happy Holidays!

Patrick J. Logue
National Sales Manager
Dunlop Motorcycle Tires

PX 1.

### (iii) The Year 1993

By the beginning of 1993, the ongoing price war had driven the resale price of Dunlop tires down. Decreased retail sales and "small dealer purchases from distributors" led to deep price cutting. PX 605 (Tucker/Rocky Feb. 1993 Report). On January 14, 1993, three days after Nichols signed its 1993 distributor agreement,[19] Logue flew to Dallas to have dinner with Nickell, Gregg, and Andre Lacy, the owner of Tucker/Rocky's parent company. Logue testified that the four men discussed the termination of distributors and the pricing of Dunlop tires. Nickell and Gregg do not recall any such conversation.[20] Logue Dep. 985–88.

Tucker/Rocky and Parts Unlimited also admit that they often complained to Dunlop about Nichols' pricing during this time frame. PX 240U (refers to "Nichols' ridiculous pricing"); PX 510 states that "our most frequent thorn is Nichols M/C in Chicago" due to deep discounting). By February 1993, Tucker/Rocky's President's Report indicated that the ongoing price war had reduced the profit margins for Tucker/Rocky to an "unacceptable" level. PX 605H.

On February 1, 1993, the two defendant distributors issued their annual published dealer price catalogs for that year. Tucker/Rocky's prices remained the same as its 1992 dealer resale prices. Parts Unlimited's prices, however, increased to reflect Dunlop's increased manufacturer's suggested dealer ("MSD") prices for 1993. The defendants argue that this disparity in pricing demonstrates the lack of a conspiracy. Nichols claims, however, that the disparity shows only that Tucker/Rocky reneged on the agreement to raise prices.

In February 1993, a new round of conversations between the defendants ensued. Pat Logue talked to Jeff Fox about Tucker/Rocky's published prices for Dunlop tires in early February 1993 at the Cincinnati dealer show. According to Logue, Fox pointed out that Parts Unlimited's published prices were significantly higher than Tucker/Rocky's published prices. 12(N)(3)(b) ¶ 31(g). Fox admits that he recalled talking to Pat Logue about price levels, but did not recall when this conversation took place. Id. Mike Buckley (who did not yet work for Dunlop) and Jeff Fox also spoke together at the Cincinnati show. 12(N)(3)(b) Reply ¶ 31(j). In addition, Pat Logue's daybook contains a notation for February 15, 1993, stating "Call J. Fox." Id. at ¶ 31(g) (citing PX 153).[21] Logue assumed that he entered the notation because he received a message to call Fox, but he could not recall the subject matter of any message or phone call. Id. Then, on February 16, 1993, Nickell, Tucker/Rocky's chairman, attended a sports banquet in Buffalo, New York, as Logue's guest. 12(N)(3)(b) ¶ 31(h). On February 17, 1993, Tucker/Rocky's phone records indicate that someone at Tucker/Rocky (although the source of the call could not be identified) placed a telephone call to the Parts Unlimited main switchboard that lasted 17 minutes and 32 seconds. There is no evidence regarding the subject matter or the persons involved in that telephone call. 12(N)(3)(b) Reply ¶ 31(i). Two days later, on February 19, 1993, Logue and Fox once again discussed Tucker/Rocky prices at a trade show.

Standing alone, these conversations, despite their coincidental (and perhaps suspi-

---

**19.** This agreement contained an alleged jury trial waiver which is discussed at the end of this Opinion.

**20.** In many instances, the testimony in this case is in conflict. Plaintiff claims that this conflict creates a credibility issue for the jury. Defendants correctly point out that Plaintiff cannot establish genuine issues of material fact with credibility arguments. *Trans Aire Int'l, Inc. v. Northern Adhesive Co., Inc.*, 882 F.2d 1254, 1257 (7th Cir.1989) (affirming entry of summary judg-

ment and dismissing plaintiff's suggestion that deposition testimony relied on by the defendant is not credible); *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir.1988) ("A motion for summary judgment cannot be defeated merely by an opposing party's incantation of lack of credibility over a movant's supporting affidavit.").

**21.** The daybook also contains notations regarding routine contact with Nichols' personnel. 12(N)(b)(3) Reply ¶ 31(g).

cious) timing, are not probative of the issue before us: whether the defendants agreed to fix prices and terminate Nichols.[22] The February conversations, however, do not stand alone; they provide the context for the two events which took place on March 22, 1993:[23] (1) Parts Unlimited published its revised dealer price list for 1993, in which it dropped its prices (including its "best quantity" price) significantly below the MSD price, thereby equalling or undercutting Tucker/Rocky's published February 1, 1993, prices—in most cases by mere cents, PX 444;[24] and (2) the March 22, 1993, Gregg Letter to Pat Logue (PX 4), the first documented communication between the three defendants since the February 19, 1993, trade show meeting between Logue and Fox.

### (iv) March 1993—June 15, 1993

The following evidence is a list of events, documents and testimony that date from March 1993 through June 15, 1994.

### (a) March 15, 1993: Tucker/Rocky Article Quoting Bob Gregg (PX 382)

An in-house article by Tucker/Rocky, regarding a Tucker/Rocky meeting, reports: Bob [Gregg] indicated that Tucker/Rocky will immediately undertake to require stable pricing and minimal discounting at the retail level of all house brands sold by Tucker/Rocky.

12(N)(3)(b) Reply ¶ 39. Gregg apparently stated: "Tucker/Rocky will take a leadership role in bringing price stability to major house brands." *Id.*

### (b) The March 22, 1993 Gregg Letter (PX 4C)

On or around March 22, 1993, Robert Gregg, the president of Tucker/Rocky, wrote a two-page letter to Patrick Logue, then the national sales manager for Dunlop, and enclosed a price analysis comparing Tucker/Rocky's and Parts Unlimited's 1992 dealer resale prices with each other and then against Dunlop's suggested dealer price. This letter is reprinted in its entirety:

March 22, 1993

Mr. Pat Logue
Dunlop Tire & Rubber Co.
P.O. Box 1109
Buffalo, NY 14240

Re: Dealer Price Analysis

Dear Pat,

Enclosed please find a detailed analysis of current Tucker/Rocky dealer prices, relative to Dunlop suggested dealer, Parts Unlimited, and Tucker/Rocky 1992. Note: Parts Unlimited and Tucker/Rocky are both published quantity prices. The following observations are of interest:

1. Tucker/Rocky 1993 prices are equal to Tucker/Rocky 1992 prices. That is, it confirms Tucker/Rocky has not passed along Dunlop's 1993 price increase.

2. Excluding ATV and Scooter, 213 tires are in the analysis. Of those the number and percentage of tires fall into the following categories:

---

**22.** At most, the admissions on record indicate that Jeff Fox of Parts Unlimited felt it was necessary to point out to Logue that Tucker/Rocky's published prices were lower than those published by Parts Unlimited. This evidence, taken at face value, reflects only Parts Unlimited's complaint and general expectation, which it believed Dunlop should hear about, that Tucker/Rocky should raise its prices in 1993. Logue's subsequent and contemporaneous discussions with Nickell of Tucker/Rocky, and Tucker/Rocky's mysterious phone call to Parts Unlimited, while sufficient to raise a question in the factfinder's mind, do not tend to point in the direction of an agreement to fix prices. Without evidence regarding the subject of these conversations, the suspicious timing alone does not take plaintiff's Section 1 case past *Monsanto.*

**23.** Parts Unlimited claims that it issued the revised price list on March 19, 1993, rather than March 22, 1993. Because the portion of that memorandum (PX 444) dated March 19, 1993, is redacted, it is impossible for the Court to make this determination. However, the portion of the memo dated March 22, 1993, appears to confirm the revision just as well.

**24.** According to Plaintiff, Parts Unlimited had never before issued revised prices prior to publication of its next annual catalog and never before had its "best quantity" prices (the subject matter of the March 22, 1993, Gregg Letter) been the same as Tucker/Rocky's prices—they were generally lower.

| TR Prices Greater Than PU | 22 | 10% |
|---|---|---|
| TR Prices 0%–3.5% Lower Than PU | 112 | 52% |
| TR Prices 3.5%–5.0% Lower Than PU | 36 | 17% |
| TR Prices 5.0% + Lower Than PU | 32 | 15% |
| TR Prices With Errors ** | 11 | 5% |

\* All K591R and K127
\* Adjusted Approx. 3/12/93

As you read this, 85% of Tucker/Rocky prices are higher or within 5% of Parts Unlimited. 15% (K591R and K127) are more than 5% lower than Parts Unlimited.

Conclusion: Tucker/Rocky would like to pass on the 1993 Dunlop price increase at this time.

(Page Two)

Problem: Tucker/Rocky pricing relative to Parts Unlimited is not relevant. Single warehouse distributors who dump tires at disruptively low and predatory prices, thousands of miles from their warehouse and service area continue to damage Dunlop's marketing objectives.

Solution: Dunlop is on record that Dunlop has too many distributors. We strongly urge Dunlop to take the action Dunlop has already identified as necessary to bring Dunlop distribution in line with market conditions. Please take into consideration the percentage of tires sold *outside* a distributor's service area (i.e., more than 500 miles from any warehouse) and the degree of disruptive and predatory pricing.

Tucker/Rocky will increase the amount of resources Tucker/Rocky spends to promote and service Dunlop tires to assure Dunlop *increased* sales and market share for Dunlop via the resulting distributor network. This extra Tucker/Rocky expenditure on behalf of Dunlop market share will increase *interbrand* competition.[25]

Sincerely,

Robert R. Gregg
President
RRG:ms/enclosure

PX 4C (emphasis in original).

During the course of discovery, the plaintiff found copies of this letter and the price analysis in the files of both Dunlop and Tuck-er/Rocky. Plaintiff also found a copy of the *first page* of the letter in the files of Parts Unlimited. PX 4A. No one knows how (or why) this page was sent to Parts Unlimited, nor who sent it (no envelope with the names of the addressee or addressor was found). The Parts Unlimited copy has a handwritten notation on the front stating:

3/26—Fred–Donna C. rec'd this in her mail today-!? (She didn't get envelope, so we don't know who it was addressed to) Janice.

(PX 4B). "Donna C." is Donna Colclasure, the person in charge of credit inquires at Parts Unlimited. 12(M) ¶ 87. "Janice" is the secretary to Jeff Fox, the current president of Parts Unlimited and Fred Fox's son. "Fred" is Fred Fox, chairman and former president of Parts Unlimited. In Fred Fox's handwriting, the following is written: "Lynne Forward to Jeff." There is no evidence that Parts Unlimited received a copy of either the second page of the letter or the attached price analysis, both of which Pat Logue at Dunlop did receive. *Id.* Pat Logue also gave a copy of the letter to his successor at Dunlop, Michael Buckley. 12(M) ¶ 83. Logue testified that he never asked for the letter, 12(M) ¶ 79, but spoke to Gregg after receiving it and was told that Gregg wanted to show that Tucker/Rocky's prices "aren't that different than those of Parts Unlimited." Logue Dep. at 301. Gregg denied any such conversation. Gregg Dep. at 328–29. Gregg also denied ever discussing the letter with Parts Unlimited. Gregg Dep. at 356. In his deposition, however, Gregg explained his motivation for sending the letter. For instance:

Question: "Why were you comparing the prices for Logue?"

Answer: "I thought he would find it interesting."

Question: "Why?"

Answer: "Because he's in the tire business."

Gregg Dep. at 269–70; Transcript at 20.

*(c) March 22, 1993: Parts Unlimited Revises Price List (PX 444)*

On March 22, 1993, Parts Unlimited issued a revision of its February 1, 1993, price list to

---

**25.** Interbrand competition means competition between different manufacturers; intrabrand competition means competition among different distributors selling the same product.

conform its prices with those issued by Tucker/Rocky on the same date. The revision went into effect on March 23, 1993. Parts Unlimited's prices were higher than Tucker/Rocky's February 1, 1993, prices with respect to the "any" price (quantity of 1), with about 2–6 cents difference. On the "best quantity" price (large orders) the differences are negligible. The parties agree that the best quantity price is the important price because most dealer discounts are applied to that number. Fox Dep. at 677; Nickell Dep. at 222.

#### (d) March 31, 1993: Phone Call (PX 624)

On March 31, 1993, Bob Gregg at Tucker/Rocky made a phone call to the Parts Unlimited switchboard; the call lasted 18 minutes. 12(N)(3)(b) Reply at ¶ 31(k). Gregg cannot remember making the call. Gregg Dep. at 455–69, 477.

#### (e) Late March 1993: Mike Buckley Replaces Pat Logue as Dunlop's National Sales Manager

In late March 1993, Michael Buckley was hired by Dunlop to replace Logue. Before hiring Buckley, Logue talked with Robert Gregg and Robert Nickell at Tucker/Rocky and Jeff Fox at Parts Unlimited to inquire whether their contacts with Buckley had been agreeable. Buckley received a favorable recommendation.

#### (f) Late March 1993: Gregg Phone Call to Buckley Regarding Termination of Distributors

Around the time of Gregg's March 22, 1993, Letter, Gregg telephoned Mike Buckley, who had just replaced Logue as Dunlop's national sales manager. According to Buckley, Gregg wanted to know if Dunlop was going to terminate any distributors. (Buckley, 91–95). Gregg, however, denied the conversation. (Gregg, 247–49; 327).

#### (g) April 1, 1993: Buckley Memo To Dunlop Distributors (PX 2)

On April 1, 1993, Mike Buckley sent a memo to all Dunlop distributors introducing himself as Dunlop's new national sales manager. PX 2. In this memo, Buckley indicated that he would be meeting with the distributors to become acquainted. He also stated that he would continue with Logue's plan to move Dunlop's distribution "to a more limited focus" in the coming months. Buckley also specifically requested a "current price list" to update his files.

#### (h) The April 8, 1993 Gregg Letter (PX 5)

On April 8, 1993, Mike Buckley received a letter from Bob Gregg regarding "1993 Suggested Dealer Pricing." This letter is reprinted in its entirety:

April 8, 1993

Mr. Mike Buckley

National Sales Manager
Dunlop Motorcycle Tires
P.O. Box 1109
Buffalo, N.Y. 14240–1109

Re: 1993 Suggested Dealer Pricing

Dear Mike:

Enclosed please find analysis of published "each" prices in the market. In most cases, Tucker/Rocky publishes manufacturer suggested dealer (MSD) prices. As you know, our current price list is from 1992 due to stock carryover.

It has been our opinion that Dunlop MSD is unrealistically high versus actual market conditions. Column # 2 is approximately 4.5% below Dunlop 1993 MSD and seems to be a more realistic level.

Just a suggestion to discuss:

How about issuing a new 1993 MSD price list that (without changing distributor cost) lowers MSD about 4.5%. This would be an official lowering of MSD, making Dunlop dealer pricing more competitive without reducing the amount for which Dunlop sells tires to distributors.

It would also make our imminent 1993 price increase more logical as we could just publish Dunlop MSD.

Please give it some thought and call me as we need to make a decision soon as to new prices.

Best regards,

Robert R. Gregg
President

RRG:ms

enclosure

P.S. Our Dunlop sales were up 15% and 16% in February and March.

PX 5.

The letter also includes a handwritten post-script, asking Buckley to find out if Parts Unlimited's new published prices are intended to be an "April Special" or "long term repricing." There is no evidence that Parts Unlimited received a copy of this letter.

*(i) April Phone Call Between Buckley & Gregg Regarding April 8, 1992 Gregg Letter*

Mr. Buckley remembers, and Mr. Gregg does not, one telephone conversation in which Mr. Buckley said he would disregard the suggestions in Mr. Gregg's April 8, 1993, Letter. 12(N)(3)(b) ¶ 31(*l*). Buckley recalls telling Gregg that "it didn't make sense to change a suggested dealer pricing in the middle of the year. There's no good reason to do that." Buckley Dep. at 139.

*(j) April 30, 1993: Logue Conversation with Motorcycle Stuff Regarding Tucker/Rocky's Low Prices*

Mr. Dodd of Motorcycle Stuff testified that he complained about Tucker/Rocky's low prices and asked Mr. Logue to take action. According to Mr. Dodd, Mr. Logue said that he would try to get Tucker/Rocky to increase its prices. 12(N)(3)(b) ¶ 31(m).

*(k) May 6, 1993: Buckley Visits Nichols, Meets Jack Jesse, and Writes Call Reports (PX 14)*

On May 6, 1993, Mike Buckley made a personal visit to Nichols in Chicago. He met Jack Jesse and other Nichols personnel, discussed Dunlop's goals, the price war and Nichols' concerns about the market.

After this meeting, Mr. Buckley made two handwritten notes of the interview designated as "call reports." These call reports state:

May 6—Meeting in Chicago w/Kenny Anderson, Terry Baisley, Jack Jesse.

Nichols staff was adamant about the fact that it is D> responsibility to improve or control the inability of Dist. to make acceptable profit margins on D> Tires. Nichols felt that T/R, P/U, M.Stuff were actively discounting D> at close to Dist. cost to all dealers. Nichols was adamant that they are *not* involved w/mail order houses. They feel that the 3 previously mentioned dist. all sell mail order houses at cost. Nichols feels its D> responsibility to address this. Jack Jesse made specific mention that if we don't address the mailorder and discounting problems that very soon Nichols will have to *stop* selling D>.[26] He also asked me what I felt sold our Tires. I replied—Advertising, Racing, Club + PR involvement, word of mouth. He replied Bull.... He feels Dealers *only* ! Sell in this system and we need to do everything possible to make them more profitable. While at this meeting we discussed Pro Sport—aline of offroad apparel and acc. exclusively imported by Nichols. While touring their warehouse I observed a container of Alpinestar Boots which they had Gray–Marketed in from Europe to sell against P/U—the exclusive importer of Alpinestar in the U.S. Aggressive Tone Throughout meeting.

(DN00438).

Meeting—Nichols Dist.

Terry Baisley
Kenny Anderson
Jack Jesse
*Topics*

Gave Dist. Interview

Talked Quite a bit about Mail order Problem

Nichols doesn't sell Mail order.

"has much concern about where current trends are taking D>

"Does not agree That D> has a "loyal" cust base

selling Dunlop if Dunlop did not respond to their price complaints or other grievances.

---

**26.** There is no other evidence in the record that any other distributor, including Tucker/Rocky and Parts Unlimited, ever threatened to stop

"Feels That dealers will begin switching to Profitable brands.

"is now importing their own Private label tire—"Kings"

This Tire is Mail order Prohibited.

Also heavily involved in their own Private label M/C acces. inc.—"Pro Sport"

Nichols has 30 Road Reps 10 Phone

Nichols feels they are a National Dist.

I sent Nichols 100 T.T.L. Brochures.

Nichols feels that P/U and T/R are causing *All* The Problem with Discounting out there.

(DN 00439). No call reports were prepared for any other distributor. (Buckley, 272–73). There was, however, a form filled out for the interview with Motorcycle Stuff. PX 15.

*(l) May 6, 1993: Buckley Spends Evening with Jeff Fox of Parts Unlimited*

Late in the afternoon on May 6th, Buckley visited Parts Unlimited's Janesville, Wisconsin office and went out for supper and drinks with Jeff Fox. Mr. Buckley called ahead to set up the meeting. Mr. Fox recalled having dinner with Buckley. Mr. Fox remembered that Mr. Buckley told him he was making a trip through the area visiting Dunlop distributors and mentioned his visit with Nichols that day, commenting that ". . . Jack Jesse was a real piece of work or something to that effect." Mr. Buckley also remembered telling Mr. Fox that he had visited Nichols on May 6 and also telling him that the visit was ". . . rather strange." Buckley denies discussing the termination of distributors with Mr. Fox. 12(N)(3)(b) ¶ 31(n).

*(m) May 7, 1993: Buckley Visits Tucker/Rocky Warehouse in Chicago*

The next day, May 7, 1993, Mr. Buckley made a visit to Tucker/Rocky's Chicago warehouse and had lunch with the Bensenville, Illinois branch manager. There is no relevant testimony regarding their conversation. 12(N)(3)(b) Reply ¶ 31(o).

*(n) Early May 1993: "Firm Commitments" (PX 17)*

In early May 1993 Buckley called Jeff Fox of Parts Unlimited and Bob Gregg of Tucker/Rocky seeking commitments from these distributors to absorb the sales volume of any unnamed distributor to be terminated. Fox and Gregg gave Buckley "firm commitments" which Buckley memorialized in a document designated PX 17. Fox admits this conversation. Gregg denies it. Although defendants collectively admit that they individually discussed the absorption of sales volume of unnamed distributors to be terminated with Buckley, they do not admit a common commitment to fix prices or terminate distributors. 12(N)(3)(b) Reply ¶ 31(p).

*(o) Late May 1993: Tucker/Rocky Issues Revised Price List (PX 214; PX 645)*

In late May 1993, shortly before Nichols' termination, Tucker/Rocky published a new dealer resale price list on Dunlop tires, which significantly raised its prices above those published on February 1, 1993.

*(p) May 20, 1993: Buckley's "Price War" Memo (PX 3)*

On May 20, 1993, Mike Buckley sent the following memo to all Dunlop distributors entitled "Price Wars." Buckley attached a Wall Street Journal Article to the memo entitled "How to Avoid a Price War." Buckley wrote:

Enclosed please find some "food for thought" regarding the negative effects of attempting to gain market share by lowering price. I think [the article] raises some extremely· valid points to the long term damage we do when we attempt these types of practices. Particularly alarming is the fact that almost never do we accomplish what we attempt (market share gain) when we do business in this way. The only thing we do is establish a "lower perceived value" for our products.

I'm sure you'll all agree that this doesn't do anything positive for our future growth. I'm not pointing fingers here; I'm just offering some more information. We can never have enough information.

The Wall Street Journal Article goes on to suggest:

"All too often, this kind of price war has no real winner except the customer."

PX 3.

*(q) Buckley's Memos to Robin Mitchell (PX 17; PX 18)*

In May 1993, Mike Buckley wrote two memos to Robin Mitchell proposing to terminate Nichols as a distributor. The first memo, titled "Reasons For Change" states:

1. Overall market size shrinking. Less sales available for same number of distributors when market was bigger.

2. National distributor expansion provides excellent regional coverage (overnight service anywhere in U.S.)

3. Nichols only real weapon right now—*discounting.*

4. Nichols recently opened warehouse in Phoenix market. Recent meeting with Nichols officials revealed plans to expand further. Next market—Dallas.

5. Recent meeting also revealed Dunlop and Nichols are at odds on how to continue to grow Dunlop business.

 Dunlop—Advertising, racing, public relations.

 Nichols—None of the above, stop mail-order.

6. Nichols focus right now on off-shore produced "house brands," pro-sport off-road apparel, kings—private label tires, etc. In this scenario, Dunlop gets used as a loss leader to leverage sales for "exclusive" products.

7. Nichols claims *no* mail-order solicitation—invoices prove otherwise.

8. Firm commitment from T/R and P/U to absorb volume of any cancelled distributor.

9. Cycle Products—credit situation makes the decision easy.

PX 17 (DN 02279).

The second memo is dated June 15, 1993, and the subject is "Motorcycle Distributor Reduction."

As a follow-up to our discussion of the above-mentioned topic two weeks ago, I want to update you on the current situation.

As I told you, Pat Logue and I agreed that since the motorcycle market continues to shrink, it has now become necessary to cut the number of distributors we have. This is a list of the reasons for this move:

1. Less sales available for same number of distributors has led to aggressive discounting tactics.

2. Expansion of national distributors allows us complete coverage off 11 parts of the country (overnight service).

3. Discounting has produced a low "perceived value" for premium Dunlop product.

The two distributors I am cancelling immediately are Nichols Distributing and P.J. Cycle Products.

Nichols is currently viewed as the leaders of the "sales by discounting" philosophy. By analyzing invoices from all over the country, it is clear that Nichols is using Dunlop as a "loss leader" [27] to leverage sales for their own private label—high margin products. In addition, Nichols management does not agree with Dunlop's marketing ideas for future growth of the Dunlop brand.

P.J. Cycle Products has gone through recent financial problems including restructuring. A continual habit of slow pay still exists and from a credit risk standpoint, this decision is much easier than the Nichols decision.

It is my feeling that this move will send a message to our current distributor base that we are very interested in maintaining profitability for our customers, in addition to our premium image which we've worked so hard to achieve. This will create more Dunlop loyalty.

Please contact me if you have further questions.

---

27. Buckley's testimony regarding his "loss leader" theory is found in his deposition: DX 13 at 114–121.

PX 18 (DN 00443). In deposition testimony, Buckley explained that he terminated distributors to achieve "an increased sense of loyalty to Dunlop" among the remaining distributors. Buckley Dep. at 167.

#### (r) June 15, 1993: Dunlop Terminates Nichols (PX 16)

In a letter dated June 15, 1993, Dunlop informed Nichols that Nichols was terminated as a Dunlop distributor, effective in five days. After 30 years of service, Dunlop's explanation, given by Robin Mitchell, was that Nichols had been terminated because of its price discounting and that Tucker/Rocky had given Dunlop the invoices showing Nichols' low prices. Dunlop terminated another distributor, P.J. Cycle (Cycle Products), which also discounted Dunlop tires. P.J. Cycle was in Chapter 11 bankruptcy and delinquent in payment.

### (v) Post–Termination Evidence

#### (a) June 1993: Tucker/Rocky Branch Manager's Report (PX 277)

A Tucker/Rocky branch manager, Bob Crawford, wrote to Nickell and Gregg reporting that a Tucker/Rocky salesman, Jay Crist was "glad to see Nichols problem being resolved and says thanks." PX 277 at 515. In the same report, Mr. Crawford wrote that another salesman, Kevin Christensen, was "also elated over the Nichols/Dunlop deal," and "hopes Shoei (Tucker/Rocky's other largest selling line) will follow suit or put pressure on their distributors." Crawford Dep. at 516.

#### (b) Joe Piazza (PX 540)

A Tucker/Rocky regional manager (Joe Piazza) indicated that Tucker/Rocky was aware of Nichols' termination before it occurred. Piazza wrote in a July 1993 report:

> There are several large accounts that I am anticipating to recapture the Dunlop business away from Nichols Distributing now that their distribution restriction has become public knowledge.

#### (c) Tucker/Rocky's Missing Branch Manager Reports

Plaintiff claims that Piazza's reports from May and June 1993 are missing and that the July statement indicates that the earlier reports would have mentioned Nichols' termination. Piazza regularly prepared reports through the fall of 1993. Other reports from Chicago, Michigan and Portland are missing, and there are no reports from Corona, California and Maryland.

#### (d) September 1993: Trade Show Memo (PX 206)

A couple months after Nichols was terminated, Buckley wrote a memo to all (remaining) Dunlop distributors which says:

> For 1994, our goals in marketing, as I mentioned earlier[,] take on a new focus. We will be committed to the dealer network, developing closer relationships with dealers through seminars, dealer visits, hospitality events, dealer incentive programs, so on. We're also going to do everything in our power to use our resources to drive customers into dealerships. By doing this, in conjunction with dealer education, we hope to combat the mail order issue.

PX 206. Plaintiff argues that this evidence is proof that Buckley's reasons for terminating Nichols, as reflected in his memo to Robin Mitchell in May of 1993, were a pretext for illegal termination pursuant to a pricefixing agreement.

#### (e) Metzeler Memo of October 5, 1993 on "Price Stability" (PX 303)

The "Metzeler Memo" was written by Guido Carissimo, a Metzeler official, recalling a meeting he had with Bob Gregg, president of Tucker/Rocky, and Greg Blackwell, president of Metzeler, on September 29, 1993. This memo states in relevant part:

> Bob hopes that with Mike Buckley Dunlop (as already discussed between them) will look for more price stability in 1994 (Dunlop has gained market share in 1993 but made many dealer angry).

PX 303. Defendants have raised a hearsay objection to the admission of this testimony pursuant to Fed.R.Evid. 802. However, for

purposes of this ruling, the Court finds this memo admissible as a business record. Fed. R.Evid. 803(6).

*(f) Tucker/Rocky Memo Regarding "Market Stabilizing Programs" (PX 280)*

In November 1992, Gregg issued a memo to Tucker/Rocky sales personnel suggesting ways to deal with "super low prices" of competitors and suggesting that dealers tell Tucker/Rocky competitors that "if they want the business they must earn it through market stabilizing programs."

*(g) Dunlop Raises MSD Mid–Year*

In October 1993, Dunlop raised its MSD price even though Buckley testified that there was "no good reason" to do so in the middle of the year. Buckley Dep. at 139.

*(h) Rick Ward (DX 36)*

Rick Ward, a Parts Unlimited Sales representative, admits that in early November 1993, shortly after the Long Beach Trade Show held at the end of October 1993, he talked with Jerry Stewart, a dealer (with inadmissible testimony) about the termination of Nichols. According to Ward, Stewart complained that Nichols had been terminated because Nichols' prices were so low. Specifically, Ward and Stewart compared specific tiring pricing—"What I was able to sell it to him at versus what he could buy it at from Nichols; us always being, you know, much more expensive than what he could buy it from the Nichols organization." Ward also admits that there was a "one-year period" in which Nichols was his most aggressive competitor for Dunlop tires. DX 36, Ward at 62.

*(i) 1994 Price Increases*

In January 1994, Dunlop raised its MSD prices again (by approximately 3–5%). PX 645. Similarly, on February 1, 1994, Tucker/Rocky and Parts Unlimited published annual catalogs in which both distributors raised their prices by significant margins. Parts Unlimited raised its catalog prices by 15 percent or more across the board. PX 645; PX 356. Tucker/Rocky increased its

prices by approximately 10 percent. PX 209. Both distributors also incorporated the MSD price as part of their price lists. Parts Unlimited adopted Dunlop's suggested dealer price as its "best quantity" price. PX 356; PX 645. Tucker/Rocky adopted Dunlop's suggested dealer price as its "each" price (the price for less than a quantity of 25). PX 645; PX 209. The "best quantity" price is the important price, because discounts are usually applied to that price. Fox Dep. at 677; Nickell Dep. at 222. Once again, Fox became "very upset" once he saw Tucker/Rocky's published prices. Several weeks after the initial publication, Parts Unlimited published a revised version, which priced all popular brands of Dunlop at a level commensurate with the prices published by Tucker/Rocky with respect to the "best quantity" price. PX 645.

*(j) Tom Peterich*

In the fall of 1993, Tom Peterich, a dealer in Northern California, told another Parts Unlimited representative, Jim Hutzer, that there would be a price hike by LeMans (Parts Unlimited) of 15 percent in the coming year. Peterich Dep. at 10–14, 66–67, 71–72.

*(vi) Inadmissible Testimony*

The following evidence tendered by Nichols has been determined to be inadmissible and therefore was not relied upon by the Court in reaching its decision.[28]

*(a) James Stewart*

This testimony is inadmissible, because the witness statement was not signed and Stewart does not admit to the statements transcribed in the statement prepared by plaintiff's counsel. *See* Fed.R.Evid. 802. Nonetheless, Stewart allegedly testified as follows:

> In approximately April of 1994, the sales representative for Parts Unlimited, Rick Ward, visited me at Cycle Country's store in Salem. He told me that Parts Unlimited had issued a new price list on Dunlop tires effective in April 1994, which changed

---

**28.** Nevertheless, the Court expressly notes that even the addition of this ambiguous evidence

would not have altered the conclusions it has reached herein.

the prices on Dunlop tires from their catalog prices published in February 1994. He said to me that Dunlop, Tucker/Rocky and Parts Unlimited had "agreed" that Tucker/Rocky and Parts Unlimited would increase their prices on Dunlop tires in 1994, and that Parts Unlimited's catalog prices reflected that agreement, and that after Parts Unlimited had published its catalog prices for Dunlop, Tucker/Rocky didn't raise their prices their prices like they said they would. Mr. Ward also said that Parts Unlimited then issued the new price list for Dunlop with lowered prices on Dunlop to the level of Tucker/Rocky's prices. Just he and I were present during the conversation. Mr. Ward gave me a copy of Parts Unlimited's new price list, which reflected lower prices for Dunlop tires than in the February 1994 catalog.

PX 456.

*(b) Rocky Trevino (PX 622)*

This is an affidavit by a dealer who stated that a different Parts Unlimited representative, Jon Hanson, told him in January of 1994, that "there was going to be a big increase in Dunlop tires, and that both Parts Unlimited and Tucker/Rocky would be increasing their prices on Dunlop tires by approximately 15%." Parts Unlimited strongly contests the admission of this testimony under Fed.R.Evid. 801(d)(2). Parts contends that this affidavit is facially ambiguous and Hanson was not involved in pricing decisions (so his remarks were not within the scope of his agency). Parts Unlimited's evidentiary arguments are well taken. This evidence will be excluded.

*(c) Terry Baisley—William Giacomelli Conversation (PX 643)*

Terry Baisley, Nichols' national sales manager, testified that in June or July 1994, he had a telephone conversation with William Giacomelli, a former branch manager at Tucker/Rocky. During the course of the conversation, Giacomelli told Baisley that Robert Gregg had told him that he (Gregg)

was responsible for pressuring Dunlop to terminate Nichols as a distributor. PX 643. This testimony is also inadmissible hearsay under Fed.R.Evid. 802.

*c. Analysis*

In this case, the "combination" of *Monsanto* and *Matsushita* is deadly. The evidence in this case is largely if not completely circumstantial, and most of it is ambiguous. The justifiable inferences that can be drawn from it, even when viewed as a whole according to plaintiff's time line and taken in the light most favorable to the plaintiff, are equally consistent with defendant's assertions of independent *and* interdependent conduct. *See Market Force*, 906 F.2d at 1173 ("conscious parallelism by itself is not enough to support an antitrust conspiracy case.... [nor does] evidence of informal communications among several parties ... unambiguously support an inference of conspiracy"). Although the Court has some suspicions that the defendants may have conspired to terminate Nichols in an uncoordinated effort to affect prices, the evidence presented to the Court is not sufficient to show that the defendants implemented and enforced a pricefixing agreement by terminating Nichols, given the standards set forth in *Monsanto* and *Matsushita*. Mere suspicion does not provide the basis from which a reasonable inference of agreement can be drawn, no matter how well-intentioned these suspicions may be.

The central question in this case is whether the defendants agreed to raise dealer resale prices and to terminate Nichols in violation of the Sherman Act. After careful review, the Court concludes that there is no unambiguous evidence of a horizontal agreement between Tucker/Rocky and Parts Unlimited to fix prices or to terminate Nichols.[29] Plaintiff is therefore left with a vertical conspiracy claim involving the three defendants. The proof of a vertical conspiracy must also fail. First, there is simply no evidence that Parts Unlimited conspired with Dunlop (and

---

**29.** Plaintiff suggests that the Court need not find evidence of an agreement to terminate Nichols, because an agreement to terminate discounting distributors *like Nichols* is sufficient. Although

we agree with this proposition, there is no significant difference in this case between the two agreements, because an agreement does not exist under either theory.

with Tucker/Rocky through Dunlop) to terminate Nichols. Without proof of a termination agreement, Nichols cannot sustain an antitrust pricefixing action against Parts Unlimited. Second, although the vertical conspiracy case against Dunlop and Tucker/Rocky is stronger, because there is some proof of collusion on the issue of termination and pricefixing, this evidence is also ultimately ambiguous and therefore insufficient to prove an agreement under *Monsanto* and *Matsushita*, because the limited inferences, added up, do not tend to exclude the possibility of independent action.

We begin by reviewing the evidence of a horizontal agreement, then discuss the absence of proof on the issue of termination against Parts Unlimited, and conclude by addressing the central question in this case: whether the evidence is sufficient to show a vertical agreement between Tucker/Rocky and Dunlop to fix prices and to terminate Nichols pursuant to that agreement. On all questions, we find that plaintiff's evidence has failed to prove the *per se* theories alleged under Count I.

*(i) The Horizontal Agreement*

■ Plaintiff alleges that there is a horizontal agreement between Tucker/Rocky and Parts Unlimited to raise and stabilize the dealer resale prices of Dunlop tires. During oral argument, plaintiff argued that the horizontal agreement is supported by "evidence that there were direct communications [between Tucker/Rocky and Parts Unlimited] and [indirect] communications *through Dunlop* between Tucker and Parts, . . ." Transcript at 9. There is no horizontal agreement in this case because the direct communications between Tucker/Rocky and Parts Unlimited do not provide any evidence of illegal conduct. *Cf. Denny's Marina, Inc. v. Renfro Productions, Inc.*, 8 F.3d 1217, 1220 (7th Cir.1993) (holding that restraint alleged by dealer constituted *per se* horizontal pricefixing conspiracy). Similarly, the in-

direct communications between the two distributors *through Dunlop* do not manifest a horizontal agreement, because the presence of Dunlop reflects a vertical arrangement. *See Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 678 F.2d 742 (7th Cir.1986) (noting factual difference between a horizontal and vertical conspiracy).

There are only two relevant examples of direct communication between Tucker/Rocky and Parts Unlimited in which Dunlop was not present: two telephone calls and several conversations at trade show meetings in early 1993. The telephone calls, although significant with respect to the time period in which they were made and the context in which they occurred, do not provide any evidence of a horizontal conspiracy because there is no testimony indicating who called whom or what was said during those conversations.[30] Even if price had been discussed, at most, these telephone calls provided a *mere opportunity* to conspire. 6 P. Areeda, *Antitrust Law* § 1417 at 97. Similarly, the trade show meetings fall under the category of "informal communications" which have been held to be, at best, ambiguous evidence of a conspiracy. *See Market Force Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1172 (7th Cir.1990) (evidence of informal communications among several parties does not unambiguously support an inference of a conspiracy); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 662 (7th Cir.1987) (evidence of informal communications discussing complaints about competitors prices is not sufficient evidence to raise an inference that there was an "agreement to set, control, fix, maintain, or stabilize prices"); *Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc.*, 878 F.2d 801, 805–06 (4th Cir.1989) (evidence that dealers agreed with a ban on discounters not sufficient to support the inference of a conspiracy). The Court therefore concludes that these conversations also merely provide opportunities for collusion rather than unambiguous circumstantial

30. During their depositions, both Fred Fox and Bob Gregg guessed what these conversations were about. Fox asserts that the February phone call involved a conversation between Jim and Sharon Ricci who left Parts Unlimited and were at that time talking to their prospective employer, Tucker/Rocky, in February 1993. Gregg speculates that the March phone call covered the subject of "SBS brake pads." Parts Unlimited was the exclusive distributor for these pads, and Tucker/Rocky wanted to sell them. 12(N)(3)(b) Reply at ¶ 31(i); Transcript at 141.

evidence from which the inference of an agreement or concerted action can be drawn. Consequently, Nichols has failed to prove a horizontal agreement between Parts Unlimited and Tucker/Rocky.

### (ii) The Vertical Agreement

■ Because there is no evidence of a horizontal agreement in this case, plaintiff's Sherman Act section 1 claims are limited to vertical conduct between Dunlop and one or both of the defendant distributors. In a vertical arrangement, both distributors need not have participated in the alleged conspiracy. For purposes of *per se* liability in this case, however, the evidence must show that at least one of the defendant distributors agreed with Dunlop to terminate Nichols *and* fix prices.[31] The evidence of a vertical agreement between Dunlop and Parts Unlimited to terminate Nichols is wholly lacking. Parts Unlimited is therefore entitled to summary judgment on Count I. Similarly, although the evidence of a vertical agreement to terminate Nichols between Dunlop and Tucker/Rocky is stronger, this evidence is also ambiguous. Finally, Nichols has no standing to assert that a pricefixing agreement caused an antitrust injury, either under the *per se* rule or the rule of reason, without a termination agreement. Under the plaintiff's theory, the antitrust injury in this case resulted when Nichols was terminated because, without Nichols' aggressive price competition, Tucker/Rocky and Parts Unlimited were able to raise prices and use their market power to force the smaller distributors to stop discounting or face termination. We will now review the evidence that is material to these determinations.

*(a) There is no evidence of parallelism supporting the inference of an agreement to terminate Nichols or to fix prices.*

■ "Judicial scrutiny of alleged concerted action, undertaken to determine whether it was the result of an agreement, is an intricate endeavor." *Alvord–Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1011 (3d Cir.1994). The intricacy in this case involves timing: the timing of the defendants' conduct

in an extremely interdependent market. If a price agreement exists in this case, it is reflected by the way the parties behaved in the market from December 28, 1992 through June 15, 1993. However, parallel behavior in an interdependent market, by itself, is not sufficient to prove the existence of an agreement to fix prices, *Reserve Supply v. Owens–Corning Fiberglas*, 971 F.2d 37, 50 (7th Cir. 1992), and the Supreme Court has "never held that proof of parallel business behavior conclusively establishes agreement or, phrased differently, that such behavior itself constitutes a Sherman Act offense." *Id.* (quoting *Theatre Enter., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 541, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954)). Parallelism, however, in an interdependent market plus conspiratorial motivation and acts against self-interest may provide the basis from which to infer an agreement under *Monsanto* and *Matsushita*. 6 P. Areeda, *Antitrust Law* § 1434 at 213.

### i) Market Theory

*The traditional agreement sought by conspiracy law involves some kind of commitment to a common cause. The commitment may be weak or strong, express or implied. Because such traditional agreements are often inferred from ambiguous circumstantial evidence, the inference may be erroneously based on competitors' parallel behavior . . . in the absence of interdependence.*

6 P. Areeda, *Antitrust Law* § 1410 at 64

Market interdependence exists when competitors "base their pricing decisions in part on anticipated reactions to them." R. Posner, *Antitrust Law: An Economic Perspective* 43 (1976). Interdependence exists when each competitor's "pricing decision is interdependent with that of its rivals: each knows that his choice will affect the others, who are likely to respond, and that their responses will affect the profitability of [its] initial choice." 6 P. Areeda, *Antitrust Law* § 1410 at 65. This process explains both price reductions and price increases. Price increases can be achieved by "oligopolistic price leadership."

---

**31.** Conversely, an agreement to terminate Nichols, without a price agreement, would limit Nich-

ols to a nonprice rule of reason claim which it has not asserted.

When one oligopolist raises his price, each of his rivals must decide whether to follow or not. Continuing the previous price would allow each of the others to increase his sales if the leader persists in charging a higher price. But each knows that the leader is likely to retract an increase that is not followed. Accordingly, each rival asks himself whether he is better off at the lower price when charged by all or at the higher price when charged by all. If the latter, as will often be the case, the leader's price increase is likely to be followed. *Id.* Price leadership can result in what is known as parallel behavior by competitors, that is, conduct by one that mirrors another.

Although interdependence must be present to infer a conspiracy from parallel behavior, it cannot serve as the only basis for a section 1 claim. *Id.* § 1411. What is needed is additional proof from which the factfinder could conclude that parallel behavior "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Id.* § 1425 at 144. Professor Areeda argues that "[i]f the actual defendants could not or would not have acted as they did without advance communication and understanding, then their action necessarily proves a traditional conspiracy." *Id.* However, as the Professor notes, this conclusion begs the ultimate question that this Court must answer, namely, whether the defendants would not have acted without such communication and assurance. Or, to put it differently, is the parallelism in this case (if it exists) "too close" for coincidence? *Id.* at 145. Our answer to that question depends upon a close analysis of three events: Dunlop's unilateral decision to terminate distributors; Parts Unlimited's decision to raise prices in 1993; and Tucker/Rocky and Parts Unlimited's 1994 price increase.

### ii) Three Examples of Non–Parallel Behavior

#### a) *Dunlop Unilaterally Decided to Reduce Its Distribution Network*

▇ On December 28, 1993, Dunlop issued a memo to all of its distributors announcing that it planned to terminate two or three distributors in 1993 because the market for replacement tires, Dunlop's largest market, was shrinking. Along with this memo, Dunlop included the 1993 Distributor Agreements which contained a termination at will provision.

Although there is evidence of informal business and social conversations between the defendants at various trade show meetings and evidence of general price complaints by Tucker/Rocky and Parts Unlimited about Nichols, there is no evidence preceding December 28, 1993, that tends to exclude the possibility that Dunlop's decision to terminate distributors was an independent action. In fact, there are numerous economic justifications for Dunlop's decision to terminate distributors which support the inference of independence.

In 1993, the tire industry was extremely interdependent. When tire sales dropped off and the number of tire dealers began to decrease in 1991, a price war between competing distributors ensued to capture the remaining sales, driving the price of Dunlop tires down, far below Dunlop's suggested dealer resale price. Dealer sales went to the lowest bidder, or to the lowest bidder with the most nonprice services to offer. Dunlop expressed concern that lower prices on a long-term basis would only achieve a "lower perceived value" for Dunlop tires. Tucker/Rocky expressed a similar concern, remarking that price stability would support the industry, whereas excessive discounting would exploit it. Additionally, because of these concerns, both Dunlop and its two largest distributors, Tucker/Rocky and Parts Unlimited, were extremely cognizant of the prices each distributor charged dealers for various Dunlop tires.

By 1993, distributor profit margins, determined in part by the difference between the distributor's cost and the dealer resale price, were also in decline (at least on Dunlop tires), due to low dealer resale prices. The record in this case confirms that Tucker/Rocky and Parts Unlimited believed that

Nichols, a small but expanding competitor, was their most aggressive competitor on price. There is also evidence that Parts Unlimited complained that Nichols was charging "ridiculous prices," which were at least partially responsible for the declining profit margins. In fact, Jeff Fox of Parts Unlimited went so far as to tell Dunlop that it should "clean up [the market]." Tucker/Rocky also complained to Dunlop about Nichols' (and other distributors') low prices, indicating that it was "unwilling to sell at those prices." Tucker/Rocky and Parts Unlimited were also concerned about Nichols' expansion into Phoenix, Arizona, and its proposed expansion into Dallas, Texas and Seattle, Washington. Finally, plaintiff argues that Tucker/Rocky and Parts Unlimited saw an opportunity to capture an increased market share once Nichols was out of the picture. Plaintiff's counsel explained, "what they're trying to do is take over the Dunlop market like they control the Metzeler market, ... They only have 68% ... of Dunlop [in 1993]. With Nichols out, they hope to get it up probably to 90, 95 [percent]...." Transcript at 33.

In an elastic market, increased sales could be generated by a large number of distributors competing vigorously on price. On December 28, 1992, however, Dunlop went on record, stating that it believed the market had become inelastic:

> The tire replacement market is not going to grow in the predictable future. Our distributor base is still at approximately the same level as it was when the market was 35% larger than it is today.
>
> Because of this situation, it is our intention to reduce our account base before the September IMAE by at least two to three distributors.

PX 1. In an inelastic market, it is economically plausible that Dunlop, having attained the largest market share in the country and convinced that the demand for Dunlop tires had stabilized and matured, sought to increase profits for its distributors by reducing its distributor base. *Cf. Valley Liquors Inc.*

v. *Renfield Importers, Ltd.*, 678 F.2d 742, 745 (7th Cir.1982) (discussing restricted distribution cases under the rule of reason and the role of market power). Dunlop's concern with its largest distributors' profit margins, although facially suspicious, is a legitimate business concern under the relevant legal precedent. *See Monsanto*, 465 U.S. at 762–63, 104 S.Ct. at 1470. Dunlop's interest in its "perceived" image is also a legitimate concern because continued lost profits for Tucker/Rocky and Parts Unlimited might translate into lost marketing services necessary to promote Dunlop's brand name. Termination of smaller competitors [32] would not reduce Dunlop's profit so long as the nonterminated distributors could absorb the sales being made by the terminated distributor(s).

None of these motivations or actions violate the antitrust laws, *so long as* Dunlop acted independently in recognition of the interdependent market. In fact, termination of a distributor following or in response to price complaints, even those that expressly or impliedly referred to Nichols, is not enough to support the inference of a conspiracy. *Valley Liquors*, 822 F.2d at 660 (citing *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1470); *Lovett v. General Motors Corp.*, 998 F.2d 575, 578 (8th Cir.1993). A defendant's actions become illegal only when its concerns and plans cross the line between encouragement and agreement.

After careful review, the Court has concluded that Dunlop's asserted reasons for terminating distributors, in general, were economically plausible and equally consistent, if not more consistent, than the conclusions the plaintiff would have the trier of fact draw from the same evidence. Despite the evidence of strong lobbying efforts by Tucker/Rocky, there is simply not enough evidence tending to exclude the possibility that Dunlop's decision to terminate Nichols was anything other than an independent action supported by the legitimate business reasons described above.

Although there is very little evidence tending to exclude the possibility that Dunlop's

---

**32.** Plaintiff's counsel admitted during oral argument that "Dunlop would have an independent right to reduce distributors to shake out the market so long as it did not terminate Nichols pursuant to a conspiracy." Transcript at 25.

decision to terminate Nichols was an independent action, there is one document, the March 22, 1993, Gregg Letter, which raises some inferences of concerted action between Dunlop and Tucker/Rocky. However, the letter raises equally reasonable (but competing) inferences on the issue of termination and pricefixing which render the letter ambiguous evidence at best. With respect to a pricefixing agreement among the three defendants, the additional evidence is equally as ambiguous.

### b) Parts Unlimited's 1993 Price Increases

On February 1, 1993, Tucker/Rocky and Parts Unlimited published their 1993 price catalogs. Parts Unlimited, despite the price war, raised its prices significantly. Given the fact that Parts Unlimited did not have the market power, by itself, to lead sales to a higher price level, it is rational to conclude that Parts Unlimited's decision to raise its prices would have been perilous without an advance agreement with its primary competitor, Tucker/Rocky, and some wholesale discounting support by its manufacturer, Dunlop. It was also an unusual move because it was contrary to Parts Unlimited's economic self-interest, given the competitive forces still in play in an admittedly sensitive market. In other words, it does not make economic sense for Parts Unlimited alone to simply raise its prices on February 1, 1993.

In the Court's view, this evidence may have been sufficient to raise the inference of a vertical pricefixing agreement if there were any objective evidence of parallel behavior between Parts Unlimited and Tucker/Rocky. Although Tucker/Rocky could have backed out of any agreement reached between the three defendants, the Court's speculation about what happened cannot provide the basis upon which we allow the section 1 claim to reach a jury. Nichols has simply failed to produce sufficient evidence that shows that Parts Unlimited's decision to raise prices resulted from an unlawful relationship with Tucker/Rocky and/or Dunlop. This is be-

cause there is no unambiguous evidence of market conduct which would tend to show that the defendants were committed to a common course of action and united by a common purpose.[33] Instead, the evidence shows erratic, unpredictable conduct that is more consistent with parties trying to obtain a competitive edge than with parties allied by a common cause.

To infer a conspiracy from parallel behavior, the parallel conduct must occur in a logically relevant manner. For instance, it cannot arise from a "plausible coincidence or an expectable response to a common business problem." 6 P. Areeda, *Antitrust Law* § 1425 at 146. Although "simultaneous" parallel action may be convincing, the time frame "is not limited to events occurring at a single moment. The definition is functional rather than literal and asks whether each alleged conspirator would normally have knowledge of another's act before deciding upon his own course of action." *Id.* at 147. In this case, the prices each competitor published would not necessarily be known before they were distributed, although once distributed they became public knowledge. Thus, there is nothing suspicious about the fact that Tucker/Rocky's prices differed from those Parts Unlimited published on February 1, 1993, especially since Tucker/Rocky's prices stayed the same as its 1992 prices.

There is no sequential parallelism in this case either. In sequential cases, the leader's action is known before the other players must make their choices. This method works if the leader can alter or reverse its position after seeing what the other competitors do. *Id.* at 147. Parts Unlimited was the leader on the price increase of 1993, and it waited until March 22, 1993, to see whether Tucker/Rocky would respond. The unfortunate coincidence for plaintiff is that on the very day that Gregg wrote the March 22, 1993, Letter to Logue confirming its desire to raise dealer resale prices to reflect Dunlop's 1993 price increase, Parts Unlimited reversed course and published prices substantially equal to those Tucker/Rocky pub-

---

**33.** Thus, there is no need to consider whether the presence of the so called "plus factors"—conspiratorial motivation and acts against self-inter-

est—support a conspiracy inference. *See* 6 P. Areeda, *Antitrust Law* §§ 1433–1434, at 218–221.

lished for 1993 on February 1. The fact that Parts Unlimited reversed course is one more indication that the minds at Tucker/Rocky never met with those at Parts Unlimited or Dunlop and vise versa.

Finally, Tucker/Rocky's price increase in May 1993 looks more like the traditional price leadership that occurs when a distributor makes the choice to risk short-term loss in the hope that its competitors will find it more profitable to sell at the higher price rather than lower one. However, Parts Unlimited did not follow Tucker/Rocky's lead. Instead, Parts Unlimited "stayed put." As counsel for Parts Unlimited phrased it during oral argument: "the best time to rock and roll on the conspiracy [was] in May '93. They didn't do it." Transcript at 139. Parts Unlimited's motivation for staying put is irrelevant since that move, combined with Tucker/Rocky's recalcitrance in February, destroys any possible theory of parallelism and any reasonable inference that can be drawn from it. In short, the relevant conduct in the market reveals that the parties were coming and going, but never once acted in a concerted way until February 1, 1994, well after Nichols had been terminated.

### c) Tucker/Rocky and Parts Unlimited's 1994 Price Increases

The 1994 increase, although a more classic example of parallelism, is insufficient, by itself, to support the inference of an agreement, without additional evidence that the parties' decisions were the result of concerted action. The fact that Parts Unlimited once again needed to revise its price list to become more competitive with Tucker/Rocky, not only with respect to the percentage of the price increase, but with respect to the "best quantity" price, precludes the concerted action inference. Typically, in the context of secret bids (like the catalogs) which ultimately become public knowledge, the inference of collusion is stronger where there is price uniformity on specific terms which would not exist but for collusion. No such uniformity existed in this case. In short, shared interests do not constitute an agreement without evidence tending to show some

symmetry and synchronicity in the parties' conduct, either simultaneous or sequential.

In this case the market was far from synchronized; it was erratic, full of unexpected shifts in movement which are not at all in synch with the actions one would expect from co-conspirators who combine to implement a common scheme. Thus, any inference of collusion that could be drawn from the 1993 and 1994 pricing movements by Tucker/Rocky and Parts Unlimited cannot be sustained given the undisputed fact that Jeff Fox had to revise his published prices downward for two consecutive years, 1993 and 1994, to meet Tucker/Rocky's more competitive (lower) levels. This conduct occurred both before *and* after Nichols' termination and therefore cannot support the inference of a conspiracy from parallel conduct because *there was no parallelism*. These pricing movements are at best ambiguous evidence because they are much more consistent with classic interdependence: each distributor resting its own decision to lead or withdraw on price based upon its belief that its competitor would do the same. Interdependent behavior without evidence of parallelism, however, does not reflect an unlawful agreement under section 1 of the Sherman Act. The inference of a Section 1 agreement under the parallelism theory must therefore be rejected.

Although the preceding evidence does not prove that a vertical agreement—either on price or termination—existed, there is one document, as alluded to previously, upon which Count I turns: the March 22, 1993, Gregg letter. We will begin with that letter and analyze the events subsequent to it in light of the inferences it raises.

### (b) The Gregg letters are ambiguous evidence and therefore do not support an inference of pricefixing or a termination agreement

#### i) The March 22, 1993 Gregg Letter

There is only one document in this case, the March 22, 1993, Gregg Letter to Logue that can be viewed as supporting the plaintiff's proof of a vertical agreement. The question this Court has carefully considered is whether this single document, viewed in

context of the record as a whole, takes the case past *Monsanto* and *Matsushita*. We believe it falls short of the mark.

There are several reasonable (but competing) inferences that can be drawn from this document. First, the concluding sentence to page one states: "Tucker/Rocky *would like to* pass on the 1993 Dunlop price increase at this time." This language suggests that Tucker/Rocky, in response to the pressure it received from Dunlop and Parts Unlimited after publication of the February 1, 1993, catalog, agreed to raise its prices in 1993 to reflect both Dunlop's 1993 price increase *and* the published increase in Parts Unlimited's prices.[34] The conditional language used in this sentence also implies some measure of control by Dunlop because the statement can be framed as a offer, requiring not only assent (or acceptance) but also the occurrence of an event or a condition precedent to form an agreement on price. Similarly, the second page encourages Dunlop to terminate single warehouse distributors "who dump tires at disruptively low and predatory prices, thousands of miles from their warehouse." In consideration of an agreement on these issues, Tucker/Rocky proposed that it would "increase the amount of resources Tucker/Rocky spends to promote and service Dunlop tires.... [which] will increase *interbrand* competition." From this language it is not difficult to infer that Tucker/Rocky was willing to increase resale dealer prices to reflect the MSD levels suggested (and desired by) Dunlop if Dunlop terminated discounting distributors, like Nichols, who prolonged the price war that made a price increase untenable. Second, the fact that Parts Unlimited received a copy of the first page of the letter implies some sort of collusion between the three defendants regarding price: the letter appears to expressly refer to the February conversations regarding Dunlop's 1993 increase of its dealer resale prices (MSD) and Parts Unlimited's complaints that Tuck-

er/Rocky did not pass on this increase in its published prices, as Parts Unlimited did.

The inferences break down with respect to Parts Unlimited, however, because neither a copy of the price analysis, which might have indicated plans to collude on specific tire prices, nor the second page of the letter addressing the termination of discounting distributors, like Nichols, was ever found in the possession of Parts Unlimited. Without these documents, Parts Unlimited cannot be tied to either a price-fixing or a termination agreement. The fact that Parts Unlimited admittedly only received a copy of the first page of the letter, although a somewhat strange coincidence, does not evidence a deliberate act to include Parts Unlimited in some form of traditional offer or acceptance.[35] *See Monsanto*, 465 U.S. at 761 n. 9, 104 S.Ct. at 1471 n. 9. The most that can be said is that Tucker/Rocky addressed Parts Unlimited's concerns and someone, either Dunlop or Tucker/Rocky, sent the first page to Parts Unlimited to set the record straight.

With respect to Tucker/Rocky, the inferences are stronger, but equally ambiguous. Given the detailed price comparison between Tucker/Rocky's and Parts Unlimited's prices, the concluding sentence of the first page may simply mean: Tucker/Rocky would like to pass on the 1993 Dunlop price increase, but our prices are already higher than those charged by Parts Unlimited, our main competitor, and we cannot afford to raise them any higher until Parts Unlimited's dealer resale prices go up even further. The second page, although evidence of strong lobbying to terminate Nichols, may be nothing more than a complaint: identifying problems and proposing solutions. Distributors are entitled to express their opinions, and manufacturers are entitled to both listen and act on the information without being charged with illegal antitrust agreements. *Business Elecs. v. Sharp Elecs.*, 485 U.S. at 726, 108 S.Ct. at

---

**34.** The fact that neither Nichols, nor any other distributor, is ever mentioned in either the first page of the Gregg Letter, or the price analysis, indicates that Tucker/Rocky is responding to the complaints Dunlop received from Parts Unlimited regarding Tucker/Rocky's 1993 published prices.

**35.** The Court must draw this inference, despite Parts Unlimited's "credit inquiry" theory, *see Transcript* at 131–32, because all reasonable inferences go to the plaintiff as the nonmoving party.

1520. In this case, both Logue and Buckley testified that they did not act on the letter, which means that their decision to terminate Nichols was not based on this letter. In similar cases, courts found similar memoranda and complaints to be insufficient evidence of an agreement. *Valley Liquors,* 822 F.2d at 660–61 (competitors' price complaints coupled with separate meetings with manufacturer before plaintiff's termination were insufficient to go to a jury); *Winn v. Edna Hibel Corp.,* 858 F.2d 1517, 1520 (11th Cir. 1988) (competitor's memo to manufacturer that it didn't discount and hoped that manufacturer would prevent plaintiff distributor from discounting, followed by termination of plaintiff, was insufficient to go to jury); *Lovett,* 998 F.2d at 577, 581 (evidence which showed plaintiffs' competing dealers complained specifically about plaintiff's pricing program and asked manufacturer to take strong action to eliminate plaintiff's program, followed by plaintiff's termination was insufficient to jury); *Helicopter Support Sys., Inc. v. Hughes Helicopter Inc.,* 818 F.2d 1530, 1533–34 & n. 4 (11th Cir.1987) ("more evidence is needed of impermissible behavior than a mere response to distributor complaints to establish liability under *Colgate* ); *Ben Elfman & Son, Inc. v. Criterion Mills, Inc.,* 774 F.Supp. 683, 685–86 n. 6 (D.Mass. 1991) (where largest distributor and a competitor of pricecutting plaintiff wrote memo to manufacturer stating that: "the problem [with plaintiff's pricing] has escalated to a point beyond which we can tolerate. You do what you must, we'll do what we must,") court held that memo was ultimatum to manufacturer to make plaintiff raise prices or to terminate plaintiff as a distributor but was insufficient evidence of an agreement under section 1. Given the competing inferences and the case law on similar issues, the Court finds that the March 22, 1993, Gregg Letter does not tend to preclude either the possibility of independent action by Dunlop to terminate Nichols, nor by Tucker/Rocky to raise its prices.

In conclusion, the Court finds that one may reasonably infer from the March 22, 1993, Gregg Letter that Tucker/Rocky strongly encouraged Dunlop to terminate Nichols, even though Nichols is never mentioned in the letter, because Gregg admits that the term "single warehouse distributors" referred to Nichols.[36] One may also reasonably infer that Tucker/Rocky offered to raise dealer resale prices to reflect Dunlop's 1993 MSD price increase, if Dunlop promised to terminate Nichols. There is no evidence, however, that Dunlop accepted this offer, even though Tucker/Rocky's prices went up in May and Nichols was terminated in June. In addition, the fact that Parts Unlimited only received the first page of the letter, but not the price analysis or the second page of the letter, renders the probative value of the first page of the letter, for purposes of finding the relevant agreements against Parts Unlimited, marginal at best.

### ii) The April 8, 1993 Gregg Letter

The inference that Tucker/Rocky held out on raising its prices until Nichols was terminated is undermined by Gregg's April 8, 1993, letter to Buckley. The April letter announced Tucker/Rocky's seemingly independent plans to raise its published 1993 dealer resale prices and *proposes* a pricefixing agreement: Tucker will trace Dunlop's MSD in its price increase if Dunlop lowers the MSD by 4.5 percent. Dunlop, however, does not lower its MSD mid-year, it raises it in October of 1993, for which Buckley concedes there was "no good reason." Furthermore, Tucker/Rocky raised its published dealer resale prices in May 1993, without waiting for Dunlop to lower the MSD. This market conduct by Tucker/Rocky and Dunlop does not evidence either simultaneous or sequential parallelism. Although there may have been a commitment by Dunlop to terminate Nichols prior to Tucker/Rocky's price increase, the equally competing inference is that Tucker/Rocky's price increase was an independent action. The Court therefore

---

**36.** Even if the March Gregg Letter constituted an agreement to terminate Nichols, it is not sufficient to state a *per se* claim under Section 1 of the Sherman Act, because it would at most constitute a nonprice restraint which, if it had an anticompetitive impact, would need to be tested under the rule of reason. Plaintiff has not alleged a nonprice restraint under the rule of reason, so the Court does not reach that question.

concludes that these two letters, plaintiff's most direct evidence of an agreement between Dunlop and Tucker/Rocky, are at best ambiguous because they raise equally competing inferences of independent action.

*(c) There is no other direct or circumstantial evidence of collusion supporting Nichols' section 1 claim*

The only other evidence of a vertical agreement between Parts Unlimited, Tucker/Rocky and Dunlop to terminate distributors involves phone calls made in early May 1993 by Mike Buckley to both Bob Gregg of Tucker/Rocky and Jeff Fox of Parts Unlimited. Buckley admittedly made these calls for the express purpose of seeking "firm commitments" from the two distributors to absorb the sales of any terminated distributor. Buckley did not call any other distributor seeking similar commitments. Jeff Fox admits that he agreed to "pick up the slack" in case there was a termination. Bob Gregg denies giving his commitment. Buckley, however, memorialized both commitments in writing at the time he made the phone calls. Although the exchange of commitments can constitute direct evidence of collusion, in this case they do not. Admittedly, the statements allude to the prospective termination of distributors, but these calls do not raise any inferences that Parts Unlimited or Tucker/Rocky did anything more than agree to absorb sales. An agreement to absorb sales is not an agreement to fix prices, nor is it an agreement to terminate a distributor in light of Dunlop's previously stated, independently asserted, decision to terminate someone due to market stasis. Further, there is no evidence that either Parts Unlimited or Tucker/Rocky agreed with Dunlop to terminate Nichols and to absorb Nichols' sales volume. Without this evidence, there is no vertical agreement between Parts Unlimited and Dunlop or Dunlop and Tucker/Rocky.

Although *Monsanto* does not impose a higher summary judgment standard upon the plaintiff, the inferences we may draw in favor of the plaintiff from ambiguous evidence are limited. *Matsushita,* 475 U.S. at 596, 106 S.Ct. at 1361. The Court has determined that the plaintiff's evidence is ambiguous and therefore insufficient to support the inference of a vertical agreement between the defendants, for the reasons given above. Summary judgment is therefore granted in favor of all defendants on Count I.

## 2. Count II: The Rule of Reason

In Count II, plaintiff restates its pricefixing and termination conspiracy claim under the rule of reason.[37] Under this rule, a plaintiff must still prove the existence of an agreement that restrains trade. An agreement under the rule of reason is not as difficult to prove as it is under the *per se* rule, because there is not a presumption of antitrust injury. In a rule of reason case, the inference of an illegal agreement may be sustained merely by producing evidence that "casts doubt" on inferences of independent action. *Capital Imaging,* 996 F.2d at 545. However, although the agreement may not be as difficult to prove under the rule of reason, additional elements must be met. For instance, a plaintiff must show that the defendants had market power to fix prices and that the pricefixing scheme had an anticompetitive impact on the market as a whole. After careful review, the Court finds that plaintiff has failed to produce sufficient evidence of anticompetitive impact for Count II to survive summary judgment.

### a. Legal Standards

Most cases fall outside the narrow, carefully demarcated categories of agreements held to be illegal *per se.* In the typical case, a plaintiff must prove an antitrust injury under the rule of reason. *Capital Imaging,* 996 F.2d 537 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993). Under this test, plaintiff bears the initial burden of showing that the challenged agreement has had an actual adverse effect on competition as a whole in the relevant market; to prove it has been

---

**37.** The idea of applying a rule of reason analysis to a vertical pricefixing violation was discussed in *Monsanto* in a footnote, 465 U.S. at 760 n. 7, 104 S.Ct. at 1469 n. 7, but was not ruled on because it was not raised at the district court level. The Court has not found any case since *Monsanto* that discusses this theory for recovery.

harmed as an individual competitor will not suffice. *Tunis Bros. Co. Inc. v. Ford Motor Co.*, 952 F.2d 715 (3d Cir.1991), *cert. denied*, 505 U.S. 1221, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992). Insisting on proof of harm to the whole market protects competition in general, rather than individual competitors. *GTE Sylvania*, 433 U.S. at 52, 97 S.Ct. at 2558 (the goal of antitrust law is to protect interbrand rather than intrabrand competition). The Seventh Circuit has held that were the law otherwise, routine disputes between business competitors would be elevated to the status of an antitrust action, thereby trivializing the Act because of its ready availability. *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1338 (7th Cir.1986) ("antitrust laws are not balm for rivals' wounds"). The plaintiff must also show that the defendant had market power, that is, the "power to raise prices significantly above the competitive level without losing all of one's business." *Valley Liquors*, 822 F.2d 656, 665 (7th Cir.1987). The Seventh Circuit has held that a district court must proceed to the first step in the rule of reason analysis, which is to balance the effects the vertical restraint has on intrabrand and interbrand competition, only if the evidence gives rise to the inference that defendants had sufficient market power to control dealer resale prices. *Id.* Ultimately, the factfinder must weigh the harms and benefits of the challenged behavior.

██ The classic articulation of how the rule of reason analysis should be undertaken is found in *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), where Justice Brandeis, speaking for the Supreme Court, said:

The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to

exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret the facts and to predict consequences.

*Id.* at 238, 38 S.Ct. at 244. Moreover, it is important to recognize that "[t]he antitrust laws were enacted for 'the protection of *competition, not competitors'*." *Atlantic Richfield*, 495 U.S. at 338, 110 S.Ct. at 1891. Termination of a small distributor pursuant to a price agreement does not restrain trade until distribution is channeled exclusively "through a few large or specifically advantaged dealers." *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) (where Court found evidence of an agreement to terminate a small distributor pursuant to an agreement with larger distributor to charge maximum prices).

### b. Analysis

██ This test is easier to state than to apply. Applying this test, the Court finds that plaintiff has failed to prove anticompetitive impact under the rule of reason and Count II must be denied. *Products Liab. Ins. Agency, Inc. v. Crum & Forster Ins. Cos.*, 682 F.2d 660, 663 (7th Cir.1982) ("plaintiff must show that the refusal to deal is likely to reduce competition"). Plaintiff's theory of anticompetitive impact is that the termination of Nichols sent a message to other small distributors, whose only competitive "weapon" against the larger distributors was price. The proof of anticompetitive impact, argues plaintiff, is that prices have gone up significantly since June 15, 1993, and smaller distributors have lost sales to Tucker/Rocky and Parts Unlimited—who absorbed not only Nichols' sales but the sales of other discounters who stopped aggressive discounting. At the outset, Nichols' only evidence of this anticompetitive impact is the testimony and opinion by its expert, Dr. Pisarkiewicz. This testimony is wholly lacking. Nichols argues that Dr. Pisarkiewicz, after extensive analysis, has concluded that the conspiracy alleged *would* result in an unreasonable restraint of trade and have a sub-

stantial adverse effect on competition (PX 608 at 4, 41–42). At page 4 of his report, Dr. Pisarkiewicz claims:

### Report of Dr. John Pisarkiewicz, Jr.

4. In summary my conclusions are as follows:

g) But for this lawsuit, there is compelling evidence that prices of Dunlop tires to dealers and to consumers would be significantly higher. This is a substantial adverse effect on competition. In addition, the termination of Nichols indicates that the defendants have the power to exclude competitors and discipline remaining competitors. This too is a substantial adverse effect on competition.

42. ... the impact on competition due to the termination of Nichols is very substantial. Nichols did challenge T/R. Nichols did challenge T/R and PU and was trying to grow in spite of discriminatory prices from Dunlop. Nichols size and long standing reputation in the industry made it a competitor to be reckoned with. Its termination by Dunlop was a strong signal to other Dunlop distributors not to challenge on the basis of price. Dunlop had already signaled all of its distributors that it was concerned about price wars (5/20/93 memo from Mike Buckley to all Dunlop distributors attaching a Wall Street Journal article, entitled, "How to Avoid a Price War." Terminating Nichols strongly reinforced that signal.

43. In addition, Dunlop has already raised prices sharply in 1993 and 1994 (App. 7, Table D–1).

44. T/R and PU receive favored treatment by Dunlop and Metzeler, and T/R and PU have used these advantages to gain market share, to earn more profits and to buy other lines of products.

Nichols contends that the full anticompetitive impact has not yet been felt, because the filing of this lawsuit prevented prices from rising to the 15 percent mark allegedly agreed upon, and has resulted in the addition of new distributors and other "anticompetitive" indicia as a cover. Nichols also claims that a question of fact exists because defen-

dants' expert, Raymond Sims, disagrees with Dr. Pisarkiewicz's analysis.

Raymond Sims does not directly controvert Dr. Pisarkiewicz's statements, and the defendants do not use his analysis in their arguments. However, Mr. Sims would testify at trial that Nichols' prices on Dunlop tires analyzed were at or below Tucker/Rocky and Parts Unlimited between 1991–93 on the 50 best selling tires. This is disputed. Sims will also testify that Nichols' profits remained "relatively stable" while the profits of Tucker/Rocky and Parts Unlimited went up from 1991 through 1993. This is also disputed.

The defendants' position on the lack of anticompetitive impact appears to relate more the lack of evidence offered by Dr. Pisarkiewicz, rather than to its experts' own opinions. For instance, in his deposition, Dr. Pisarkiewicz admits that he has made no analysis of actual prices that dealers paid for tires, 12(M) ¶ 174 (Pisarkiewicz Dep. at 434, 523); that he has no opinion on whether Tucker/Rocky or Parts Unlimited is pricing at, above or below competitive levels before or after the Nichols termination, *Id.* (Pisarkiewicz Dep. at 434); that he has no information that the Nichols termination led to reduced market output, *Id.* (Pisarkiewicz Dep. at 510–11); and that he has no formation that the Nichols termination led to a deterioration in the quality of service available to dealers, *Id.* (Pisarkiewicz Dep. at 511).

These admissions are crucial because:

[t]here is a sense in which eliminating even a single competitor reduces competition. But it is not the sense that is relevant in deciding whether the antitrust laws have been violated. Those laws, we have been told by the Supreme Court repeatedly in recent years, are designed to protect the consumer interest in competition. The consumer does not care how many sellers of a particular good or service there are; he cares only that there be enough to assure him a competitive price and quality.

*Products Liability,* 682 F.2d at 663–64 (citations omitted). In short, there is no evidence provided by Dr. Pisarkiewicz, other than his theory that "but for this litigation"

prices would not be competitive, that the termination of Nichols, due to its aggressive discounting, sent a message that reduced competition and injured consumers or their dealers. This testimony is not sufficient evidence to withstand a motion for summary judgment, even under the rule of reason, because it is mere speculation, without a sound economic analysis to support it. Therefore, the Court must grant the defendants' Motions for Summary Judgment because the plaintiff failed to produce evidence of anticompetitive impact on the market as a whole.

### 3. Count III: Group Boycott

In Count III, Nichols vaguely alleges that the defendants' actions constitute an illegal group boycott in violation of section 1 of the Sherman Act. Nichols claims that Tucker/Rocky and Parts Unlimited convinced both Dunlop and Metzeler not to deal with Nichols. To prove a group boycott, Nichols must allege a horizontal agreement by Tucker/Rocky and Parts Unlimited to engage in concerted activity to deprive Nichols of access to sell motorcycle tires. *Business Electronics*, 485 U.S. at 734, 108 S.Ct. at 1524; *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Phil Tolkan Datsun, Inc. v. Greater Milwaukee, Etc.*, 672 F.2d 1280, 1284 (7th Cir.1982). Although some group boycott claims (those involving concerted refusals to deal with a competitor) are analyzed under the *per se* rule, *Klor's Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), Nichols has alleged its section 1 group boycott claims under the rule of reason and therefore must show anticompetitive impact. Thus, Nichols must only submit some evidence that Tucker/Rocky and Parts Unlimited agreed to induce Metzeler not to add Nichols as a distributor, or that Tucker/Rocky and Parts Unlimited agreed to induce Dunlop to terminate Nichols as a distributor.

Although there is "some" ambiguous circumstantial evidence that the defendant distributors agreed to induce Dunlop to terminate Nichols, there is no evidence of an agreement among Tucker/Rocky and Parts Unlimited to induce Metzeler to refuse to deal with Nichols. The only evidence of any inducement is a conversation Metzeler President Greg Blackwell had with Tucker/Rocky and Parts Unlimited regarding the addition of new distributors in general and Nichols in particular. The defendant distributors independently advised Blackwell that they did not advise adding new distributors, in particular, Nichols, a known discounter. This evidence does not satisfy the concerted action/agreement requirement. Regardless, there is no evidence of anticompetitive impact, with respect to a boycott involving Dunlop or Metzeler, for the reasons expressed in Count II. Therefore, Count III also fails for lack of proof on the element of anticompetitive impact.

### B. The Illinois Antitrust Act

In Counts IV, V and VI, plaintiff alleges various vertical and horizontal agreements between the defendants to fix prices, terminate Nichols and refuse to deal with Nichols. Counts IV and V must be dismissed for failure to state a claim. Count V states a rule of reason claim under section 3 of the Illinois Antitrust Act, 740 ILCS 10/3. Summary judgment must be granted for the defendants on all counts.

### 1. Count IV: *Per Se* Pricefixing

In Count IV, plaintiff alleges that the defendants conspired to raise, fix, maintain or stabilize prices, in violation of section 3 of the Illinois Antitrust Act ("IAA"), 740 ILCS 10/3. Because Nichols levies its allegation against "all defendants," that is, Dunlop (a seller), Tucker/Rocky (a buyer) and Parts Unlimited (a buyer), it alleges a *vertical* pricefixing agreement. Nichols' claim fails as a matter of law.

*Per se* offenses are those set out in section 3(1) of the IAA. *See* 740 ILCS 10/3, Bar Committee Comments–1967 (1993). "The conduct proscribed by section 3(1) is violative of the Act without regard to, and the courts need not examine, the competitive and economic purposes and consequences of such conduct." *Id.* The Bar Committee Comments clearly state, however, that a vertical

pricefixing agreement is not prohibited under section 3(1):

> Section 3(1) does not reach vertical agreements, such as agreements between buyers and sellers fixing the price at which the buyer shall resell. Although not unlawful under section 3(1), such vertical price fixing, if not exempt under the Illinois Fair Trade Act, may be proscribed by section 3(2), the general restraint of trade section. Since the draftsmen carefully constructed section 3 to require it, the Illinois courts should conclude that they must examine the competitive and economic purposes and consequences of such agreements before reaching a conclusion that section 3(2) has been violated. While it is perhaps possible, as under Federal law, that the courts may hold such agreements violative of section 3(2) without such an examination, they should not, since to do so would defeat the clear intention of the draftsmen.

*Id.* The Bar Committee Comments could not be any more explicit that a vertical agreement may not constitute a *per se* violation of section 3 of the IAA, because *per se* claims are only those listed in section 3(1), which does not cover vertical pricefixing agreements. While Nichols could have alleged that "all defendants" violated section 3(2), the general restraint of trade subsection of the IAA, section 3(2) necessarily requires a rule of reason analysis of the "economic purposes and consequences" of the agreement and therefore does not contemplate *per se* violations. Count IV fails as a matter of law.

### 2. Count V: Rule of Reason

In *Laughlin v. Evanston Hosp.*, 133 Ill.2d 374, 140 Ill.Dec. 861, 871, 550 N.E.2d 986, 996 (1990), the Illinois Supreme Court held that the analysis for rule of reason claims under section 3 of the Illinois Antitrust Act, 740 ILCS 10/3, tracks the legal analysis applied in federal cases under section 1 of the Sherman Act. Therefore, since Count V is the counterpart to Count II, which alleges a rule of reason claim under section 1 of the Sherman Act, the Court grants summary judgment for all defendants on this claim for the reasons expressed in the portion of the opinion analyzing Count II.

### 3. Count VI: Group Boycott

[24] Nichols alleges in Count VI that the actions of all the defendants constitute a *per se* illegal group boycott in violation of section 3 of IAA. Because Nichols alleges a *per se* violation of the IAA, its claim falls under section 3(1) of the IAA, which is the only subsection of the IAA that refers to *per se* violations. *See* Bar Committee Comments–1967 (1993). The Bar Committee Notes are clear however, that an alleged boycott does not present a legally cognizable claim under Section 3(1). In its discussion of claims under section 3(1), the Comments note that:

> [b]oycotts are not proscribed by this "per se" subsection. Here again in view of federal precedents and of Section 11, horizontal boycotts may be found unlawful under the general restraint of trade Section 3(2). Vertical agreements to refuse to deal or boycotts, that is, agreements between persons at different levels of production and distribution which have as their immediate purpose the depriving of a third person of a supply of a commodity or service, may also be found violative of Section 3(2).

*Id.* Thus, although Nichols could have alleged a group boycott under section 3(2), it has instead alleged a *per se* violation, which falls under section 3(1) of the IAA and does not contemplate group boycotts. Count VI therefore fails as a matter of law.

### C. The Robinson–Patman Act Claims

### 1. The Facts

Price is an important sales determinant in the industry. 12(N)(3)(b) ¶ 57. Motorcycle tire manufacturers (*i.e.*, Bridgestone, Cheng Shin, Continental, Dunlop, Metzeler, etc.) commonly provide discounts, including volume-based discounts, in selling tires to distributors. 12(M) ¶ 323. The defendants concede that Dunlop provided discounts to Nichols' competitors that Nichols did not receive. 12(N)(3)(b) ¶ 44. For instance, Parts Unlimited requested and received from Dunlop a one-time special promotional discount for the opening of its facility in Southern California. 12(M) ¶ 312 (PX 181). Tucker/Rocky and Parts Unlimited also admit

that they knew of and took advantage of discounts that Dunlop did not publish but made available to them. 12(N)(3)(b) ¶ 53. Because Tucker/Rocky and Parts Unlimited are sophisticated business entities that separately monitor information from dealers about prices at which competitor distributors sell products, 12(N)(3)(b) ¶¶ 51–52, they knew they were receiving individually negotiated prices on Dunlop tires. 12(N)(3)(b) ¶ 53 (PX 161–187). For instance, Pat Logue of Dunlop informed them that large orders would permit Dunlop manufacturing facilities to have longer production runs on specific tires without the need to stop production, change molds, and switch over to producing other types of tires. 12(M) ¶ 322. Large orders, in turn, would result in greater discounts during certain periods.

Other distributors, such as Bell Industries, Dixie, KK Motorcycle, and Pike's Peak, also received a variety of discounts. Bell Industries, Dixie, Parts Unlimited, and Tucker/Rocky earned Dunlop's growth bonus in 1993. 12(M) ¶ 316. Motorcycle Stuff is a Dunlop distributor headquartered in Cape Girardeau, Missouri. Over the past four years, according to Nichols' expert report, Motorcycle Stuff has purchased fewer Dunlop tires each year than did Tucker/Rocky or Parts Unlimited. During the years 1990–93, even Nichols' expert concludes that Motorcycle Stuff received significantly higher overall discounts than Tucker/Rocky, Parts Unlimited, Nichols, or any other Dunlop distributor. 12(M) ¶ 317.

Tucker/Rocky also received a range of discounts from Metzeler, Dunlop's largest rival in the alleged "premium tire" market. 12(M) ¶ 323. Moreover, Nichols, the exclusive distributor of King's tires in the United States, offered a volume-based discount to its customers. 12(M) ¶ 313. Sometimes Nichols also offered lower prices on Dunlop tires to its dealers than were offered by Tucker/Rocky, Parts Unlimited, and Motorcycle Stuff in the marketplace. 12(M) ¶ 318. One printed report produced by Nichols indicates that Nichols gave discounts on Dunlop tires to almost 600 of its customers. These discounts were well over 20% off the best published pricing for many of Nichols'

customers. For instance, Nichols discounted Dunlop tires by 20–24 percent for 88 of its customers and discounted Dunlop tires by 25 percent or more for 72 of its customers. 12(M) ¶ 319.

The difference between the gross margins of Tucker/Rocky and Nichols on the sale of Dunlop tires during the relevant period was significantly greater than the alleged price advantage received by Tucker/Rocky. 12(M) ¶ 324. Dunlop distributors faced and continue to face intense intrabrand competition from other Dunlop distributors during all relevant periods. 12(N)(3)(b) ¶ 55 (PX 252U; PX 251; PX 250U; PX 249U; PX 240U; PX 510; PX 248; PX 246; PX 242U; PX 267U; PX 605F; PX 239U; PX 605H; PX 274; PX 248; PX228; PX 280; PX 22). The average price (the yearly revenues from the sale of Dunlop tires divided by the annual unit sales on an indiscriminate basis, without regard to product mix by model or type or size) on Dunlop tires sold to dealers decreased from 1991 to 1993 for Nichols, Tucker/Rocky and Parts Unlimited. 12(N)(3)(b) (PX 609 at 13).

## 2. The Merits

### a. Dunlop: Section 2(a)

 Dunlop seeks summary judgment on Count VII, Nichols' section 2(a) Robinson–Patman Act claim. To establish a *prima facie* violation of section 2(a), a plaintiff must establish the existence of (1) price discrimination, and (2) injury to competition. *See* Robert M. Klein, *The Robinson–Patman Act: Jurisdictional Aspects and Elements*, 59 *Antitrust L.J.* 777 (1991). Dunlop does not contest that price discrimination occurred, but asserts that Nichols has failed properly to establish injury to competition. Because Nichols' assertions and its expert's analyses demonstrate, however, that Nichols has properly asserted at least two types of damages under the Act, it must prevail on Dunlop's motion for summary judgment.

Nichols claims three types of damages under the Act: (1) damages for *lost profits* on sales of Dunlop tires that it actually made (because it was not receiving the same discounts that Dunlop granted to the defendant distributors and had to sell at lower prices

than those at which it would have sold absent the price discrimination); (2) damages for *lost sales* of Dunlop products that Nichols was not able to make because of its increased costs; and (3) damages for *lost sales* of Dunlop products that it otherwise would have made from customers who would have been drawn to buy from Nichols had Nichols been able to offer more attractive prices on Dunlop products. Pl.'s Mem.Opp.Def.'s Mot. Summ.Judg. at 72–73. Dunlop asserts in its motion for summary judgment that the first type of damages that Nichols claims amounts to "automatic damages" (*i.e.*, damages measured by the amount of the alleged price discrimination, which are not recoverable under the Act). Def.'s Mem.Supp.Mot. Summ.Judg. at 22–23. Dunlop further asserts that the second and third type of damages represent legally deficient theories that rest on unsupported assumptions. *Id.* at 25, 28.

"Like any damages remedy, the purpose of [the Clayton Act] is to place the antitrust plaintiff as far as possible in the position it would have occupied but for the violation. Thus, any calculation of section 4 damages must strive to approximate a violation-free state of affairs." *Rose Confections, Inc. v. Ambrosia Chocolate Co.*, 816 F.2d 381, 394 (8th Cir.1987).

The first type of damages claimed by Nichols, lost profits due to the fact that Nichols was forced to sell Dunlop tires at lower prices than it would have absent the price discrimination, is not "automatic damages" as defined by the Supreme Court in *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981). In *J. Truett Payne*, the Court noted that the plaintiff could not merely infer damages from the fact that the defendant had engaged in discriminatory pricing irrespective of any showing that the defendant's behavior had an effect on competition. *Id.* at 563–64, 101 S.Ct. at 1927–28. The plaintiff had failed to produce any documentary evidence to show the effect of the discrimination on retail prices. *Id.* at 564, 101 S.Ct. at 1928.

In contrast, Nichols presents evidence prepared by its economic expert, Dr. John Pisarkiewicz, that calculates Nichols' market share prior to the period of the alleged discrimination, computes Nichols' projected market share absent any price discrimination for the period 1991–93 (the time of the alleged price discrimination), and alleges that Nichols' actual market share for that period declined and its competitors' shares increased as a result of Dunlop's alleged discriminatory behavior. App. to Pl.'s Mem.Opp.Defs.' Mots. Summ.Judg. Vol. III, Tab 608, at 44. Nichols also presents evidence of its declining market share and its competitors' simultaneously rising market share during the period of the alleged discrimination—fluctuations that Pisarkiewicz attributes to competitive injury. App. to Pl.'s Mem.Opp.Defs.' Mots. Summ.Judg., Vol. III, Tab 608, at I and VI. Although Dunlop contests that Nichols has failed to demonstrate a sufficient causal connection between Nichols' declining market share, Tucker/Rocky's and Parts Unlimited's rising market share, and the alleged discriminatory behavior, Nichols has done more than simply claim automatic damages, and thus has asserted sufficient facts to support a finding of injury due to increased costs. *See J. Truett Payne*, 451 U.S. at 565, 101 S.Ct. at 1929 (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123–24, 89 S.Ct. 1562, 1576–77, 23 L.Ed.2d 129 (1969)) (noting that damages may be awarded on the basis of plaintiff's estimate of sales it could have made absent the violation); *id.* at 566, 101 S.Ct. at 1929 (citing *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946)) (noting that damages may be awarded on the basis of comparison of plaintiff's profits with the contemporaneous profits of a competitor who was not the victim of discriminatory pricing, together with evidence of plaintiff's profits during the conspiracy as compared with his profits prior to the conspiracy).

The second type of damages claimed by Nichols, lost sales of Dunlop products that Nichols was allegedly unable to make due to the discriminatory pricing, is also a legally permissible type of damages as long as Nichols' expert's calculations properly approximate a violation-free state of affairs as opposed, for example, to one in which Nichols was able to share in the benefit of the dis-

criminatory pricing. *See Rose Confections,* 816 F.2d at 394. Nichols has properly done so.

Using Nichols' pre-violation market share, which takes into account not just the relative market shares of Tucker/Rocky and Parts Unlimited, but the other fourteen nationwide Dunlop distributors, Dr. Pisarkiewicz estimates what Nichols' market share would have been for 1991–93 absent the alleged discriminatory pricing. Dunlop contends that Nichols' loss of market share was due to its poor customer service; if this is the case, however, it is a factual determination that must be made by a jury. Nichols has therefore asserted at least two types of damages recognizable under the Act, therefore this Court must deny Dunlop's motion for summary judgment on this issue.[38]

### b. *Tucker/Rocky and Parts Unlimited: Section 2(f)*

██ Tucker/Rocky and Parts Unlimited also seek summary judgment on Count VII, with respect to Nichols' claim that they violated section 2(f) of the Robinson–Patman Act, which makes it unlawful for a buyer "knowingly to induce or receive a discrimination in price which is prohibited" by the Act. 15 U.S.C. § 13(f). In order to establish a *prima facie* case under section 2(f), Nichols must show that Tucker/Rocky and Parts Unlimited knew or should have known that its was receiving greater discounts from Dunlop than Nichols, and that it knew or should have

known that the lower prices it induced or received from Dunlop were discriminatory in violation of section 2(a) of the Act. *Automatic Canteen Co. v. FTC,* 346 U.S. 61, 74, 73 S.Ct. 1017, 1024, 97 L.Ed. 1454 (1953).

Although Nichols' evidence shows that Tucker/Rocky and Parts Unlimited received higher discounts from Dunlop than Nichols did, Nichols is unable to show that either distributor possessed the requisite knowledge (*i.e.,* knew the amount of discounts any other distributor, including Nichols, received). Both Tucker/Rocky and Parts Unlimited deny that they had any knowledge of the amount of discounts that any other distributor received. *See* Rule 12(N)(3)(b) Reply ¶¶ 52–54. Nichols' assertion that Tucker/Rocky and Parts Unlimited knew that they received better discounts than did Nichols, *see* 12(N)(3)(b) ¶¶ 52–54, is based on a single document (PX 158) that merely lists the annual volume bonus discounts available for 1992. Based on this list, Nichols claims that Tucker/Rocky and Parts Unlimited knew or should have known that the discounts greater than those listed were not generally available to the other distributors. *Id.* at ¶ 53. However, there is no dispute that Dunlop individually negotiated prices with its distributors. *Id.* This is indicated by the fact that Nichols received a 6 percent volume bonus discount in 1992, an amount higher than that listed in the Dunlop distributor program. Rule 12(M) ¶ 304. Although Nichols asserts that Tucker/Rocky and Parts

---

**38.** The third measure of damages, lost sales on non-Dunlop products is not cognizable because Dr. Pisarkiewicz uses a statistical regression analysis to determine the percentage of Dunlop buyers who would also buy non-Dunlop products and the amount of these products that the buyers would purchase, without demonstrating evidence of a causal connection between the injury and the asserted damages. *See, e.g., BASF Corp. v. Old World Trading Co.,* 41 F.3d 1081, 1093 (7th Cir.1994) (finding causation to be established where the plaintiff presented evidence that many customers would not have purchased from the defendant had they known of the defendant's wrongdoing and that the plaintiff's position in the market would have been more advantageous absent the defendant's wrongful conduct); *ALPO Petfoods, Inc. v. Ralston Purina Co.,* 778 F.Supp. 555, 560 (D.D.C.1991) (noting that statistical regression analyses, "while useful for demonstrating general trends and the broad impact of cer-

tain actions, are simply not usable with respect to the type of specific, concrete evidence needed. Without the regression analyses, however, there is nothing in the record from which this Court can deduce a lost profits figure without speculation."), *aff'd in part and rev'd in part on other grounds,* 997 F.2d 949 (D.C.Cir.1993); *Nikkal Indus., Ltd. v. Salton, Inc.,* 735 F.Supp. 1227, 1233 (S.D.N.Y.1990) (finding that linear regression analysis "did not provide for the impact of other significant factors, such as the possible effect on sales of a declining trend in the popularity of [the product], the appearance of several competitors, vigorous price competition and, most importantly, [the plaintiff's] poor marketing strategy."). For example, Plaintiff would need to offer something along the lines of testimony from buyers who would have bought non-Dunlop products from Nichols who went elsewhere because of price discrimination on Dunlop products.

Unlimited not only received higher discounts than those listed but also different discounts than those listed is insufficient, without a factual showing, to support the inference that Tucker/Rocky and Parts Unlimited knew that Nichols did not receive non-listed discounts. This evidence, taken together with Tucker/Rocky's and Parts Unlimited's denials of knowledge (which has not been controverted), must be taken as true. Tucker/Rocky and Parts Unlimited therefore had no basis to determine how the discounts they were able to negotiate from Dunlop compared to those that Nichols was able to negotiate.[39]

Nichols argues, however, that Tucker/Rocky and Parts Unlimited should have known that they were receiving discriminatory prices based on their dominant positions in the marketplace (the two distributors together accounted for 60% of all Dunlop sales nationwide) and their extensive trade experience. Pl.'s Mot.Opp.Defs.' Mot.Summ.Judg. at 84; Rule 12(N)(3)(b) ¶¶ 53–54. Nichols notes that "trade experience in a particular situation can afford a sufficient degree of knowledge to provide a basis for prosecution." *Automatic Canteen*, 346 U.S. at 79–80, 73 S.Ct. at 1027. In *Automatic Canteen*, however, the Supreme Court stated in dicta that "[b]y way of example, a buyer who knows that he buys in the same quantities as his competitor and is served by the seller in the same manner. . . . as the other buyer can fairly be charged with notice that a substantial price difference cannot be justified." *Id.* at 80, 73 S.Ct. at 1027. This is not the case in the instant situation. Both Tucker/Rocky and Parts Unlimited bought from Dunlop in greater quantities than Nichols and neither has been shown to be aware of what price any other distributor received, much less the existence of any "substantial price difference." Nichols' claim is further weakened by the fact that Motorcycle Stuff, another distributor, who has not been named as a defendant in this lawsuit, received greater dis-

counts than both Tucker/Rocky and Parts Unlimited even though it bought fewer tires than either of these defendants. Even if Nichols could show that Tucker/Rocky and Parts Unlimited were aware of the amount of discounts that other distributors received, the fact that Motorcycle Stuff's discounts exceeded Nichols', Tucker/Rocky's, and Parts Unlimited's would have provided Tucker/Rocky and Parts Unlimited with reason to believe that the prices offered to them were not discriminatory. Therefore, Nichols has failed to show that the defendants had the requisite knowledge under section 2(f) of the Act, and summary judgment is granted in favor of Tucker/Rocky and Parts Unlimited on Count VII.

### 3. The "Meeting Competition" Defense

Section 2(a) of the Clayton Act, as amended by the Robinson–Patman Act, 15 U.S.C. § 13(a), makes it illegal to discriminate in price between buyers when the consequence is an injury to competition. *Reserve Supply Corp. v. Owens–Corning Fiberglas Corp.*, 971 F.2d 37, 41 (7th Cir.1992) (citing *United States v. United States Gypsum Co.*, 438 U.S. 422, 450, 98 S.Ct. 2864, 2880, 57 L.Ed.2d 854 (1978)). To establish a *prima facie* violation of section 2(a), a plaintiff must establish the existence of (1) price discrimination, and (2) injury to competition. *See* Robert M. Klein, *The Robinson–Patman Act: Jurisdictional Aspects and Elements*, 59 *Antitrust L.J.* 777 (1991). A *prima facie* violation, however, may be rebutted by one of the Robinson–Patman Act's two affirmative defenses: (1) "cost justification" or (2) "meeting a competitive price" (commonly known in this case as the "meeting competition" defense). *Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 434, 103 S.Ct. 1282, 1288, 75 L.Ed.2d 174 (1983). If established, an affirmative defense eliminates the need to decide the issue of injury to competition, because a properly established defense renders such injury justifiable. Dunlop asserts

---

**39.** Both Tucker/Rocky and Parts Unlimited note that Dunlop's pricing structure was highly individualized and flexible, and that there was no

way for them to determine independently the amount of the discounts that another distributor

the meeting competition defense,[40] contained in section 2(b) of the Act, which states:

> [t]hat nothing herein contained shall prevent a seller rebutting the *prima facie* case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor.

15 U.S.C. § 13(b) (1975) (emphasis added). Price discrimination under the Robinson–Patman Act "is merely a price difference" between the price for which a defendant sells to one buyer versus the price to which it sells to another. *Falls City*, 460 U.S. at 443 n. 10, 103 S.Ct. at 1293 n. 10 (quoting *FTC v. Anheuser–Busch, Inc.*, 363 U.S. 536, 549, 80 S.Ct. 1267, 1274, 4 L.Ed.2d 1385 (1960)). Although the burden of establishing a factual basis for the defense falls on Dunlop, *see Falls City*, 460 U.S. at 451, 103 S.Ct. at 1297, all reasonable inferences must be drawn in favor of Dunlop because Nichols is the moving party.[41]

■■■ The section 2(b) defense has two elements; both must be factually supported to send the defense to a jury. The two elements of a section 2(b) defense are as follows. First, "the seller, who has knowingly discriminated in price, [must] show the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor." *FTC v. A.E. Staley Mfg. Co.*, 324 U.S. 746, 759–60, 65 S.Ct. 971, 977, 89 L.Ed. 1338 (1945) (emphasis added). Second, "the seller must demonstrate that its price was a good-faith response to a competitor's lower price." *Reserve Supply*, 971 F.2d at 41 (citing *Falls City*, 460 U.S. at 451, 103 S.Ct. at 1297).

■■■ The determination of whether a seller acted in good faith does not lend itself to the application of a rigid standard. The Supreme Court has stated that the concept of good faith is

> flexible and pragmatic ... Rigid rules and inflexible absolutes are especially inappropriate in dealing with the § 2(b) defense; the facts and circumstances of the particular case, not abstract theories or remote conjectures, should govern its interpretation and application.

*Gypsum*, 438 U.S. at 454, 98 S.Ct. at 2882 (quoting *Continental Baking Co.*, 63 F.T.C. 2071, 2163 (1963)). The Supreme Court has, however, identified four factors that may be relevant to the determination of the seller's good faith. These include whether the seller (1) had received reports from other customers of similar discounts; (2) was threatened with a termination of purchases if the discount were not met; (3) made efforts to corroborate the reported discount by seeking documentary evidence or by appraising its reasonableness in terms of available market data; and (4) had past experience with the buyer. *Gypsum*, 438 U.S. at 454–55, 98 S.Ct. at 2882. We rely on the above standards in assessing whether Dunlop has successfully asserted an affirmative defense under section 2(b).

#### a. Background

Nichols moves for partial summary judgment pursuant to Federal Rule of Civil Procedure 56 on Dunlop's section 2(b) defense, contending that Dunlop has not made a sufficient factual showing to demonstrate that the price discrimination was made in good faith to meet the equally low price of a competitor and that Dunlop had no procedures in place for verifying the existence of any alleged equally low price of a competitor. Pl.'s Mem. Supp.Mot.Part.Summ.Judg. at 4. "When a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250. Because the question of whether the section 2(b) defense has been successfully asserted "de-

might be receiving. *See, e.g.,* Tucker/Rocky Mem.Supp.Mot.Summ.Judg. at 31–32.

**40.** Dunlop initially asserted, but has since withdrawn, a cost justification defense, which is therefore no longer an issue in this case.

**41.** As the moving party, Nichols has the burden of showing that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(c).

mands a 'fact-specific' inquiry," *Reserve Supply*, 971 F.2d at 43 (quoting *Gypsum*, 438 U.S. at 454–55, 98 S.Ct. at 2882), we now review the material facts presented by the parties in order to determine whether Dunlop has successfully demonstrated that there is a genuine issue for trial.

Dunlop contends that it has demonstrated "the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor." *Falls City*, 460 U.S. at 438, 103 S.Ct. at 1290 (citations omitted). In support of its contention, Dunlop provides deposition testimony and a supplementary affidavit from Patrick Logue, Dunlop's national sales manager from approximately 1987 to March 1993. Logue states that when distributors would report to him that they were being offered better discounts from Dunlop's competitors, Logue would attempt to obtain specific details about the offer directly from the distributor, but generally would accept the distributor's word that such discounts were in fact being offered. App. to Def.'s Rule 12(N) Resp., Tab 7, at 1288. Logue would consider his prior experience with the customer and his opinion of the customer's honesty and integrity in evaluating the customer's information. Def.'s Mem.Opp.Pl.'s Mot.Part. Summ.Judg. at 7. Where possible, Logue would refer to the competitors' price lists on file with Dunlop in an attempt to verify that the alleged competing discount was in line with the competitor's published prices. App. to Def.'s Rule 12(N) Resp., Tab 7, at 1288. These price lists, however, were sometimes outdated and, in any case, did not include the unofficial discounts frequently offered by tire manufacturers. *Id.* at 1289. Logue states that he was not aware of any other method of verification used to ensure that the discount he offered was necessary to meet competition. *Id.* After following these standard practices, Logue would determine whether meeting the competitive offer was consistent with Dunlop's business objectives. Def.'s Mem.Opp.Pl.'s Mot.Part.Summ.Judg. at 7. If so, he would seek to meet the competitive offer by offering additional discounts to these customers that he believed to be equivalent to the competing offers. *Id.* at 8. Logue states that he believed that the failure to do so would result in a loss of business to Dunlop. *Id.*

Specifically, Logue states that he had conversations with Robert Nickell, president of Tucker/Rocky; Jeffrey Fox, president of Parts Unlimited; and James and Timothy Dodd, president and vice president, respectively, of Motorcycle Stuff, in which they discussed with him the prices and discounts that they were receiving from Dunlop's competitors that were more favorable than those received from Dunlop. App. to Def.'s Rule 12(N) Resp., Tab 1, ¶¶ 23–25, 29, 35–38, 48–50. In the case of Tucker/Rocky, Logue states that Nickell typically provided him with "some details about those programs and incentives," but generally refused to disclose further details when asked. *Id.* ¶ 25.

Logue does not indicate, however, whether "some details" included specific numerical information as to prices or discounts offered by Dunlop's competitors. *See id.* In the case of Parts Unlimited, Logue states that "on several occasions when I tried to obtain specific information about specific competitive discounts from Mr. Fox, he informed me that it was not his practice to disclose such information between competitors.... [I]t was not his practice to provide me with competitors' specific prices or all the other specific details about their discounts." *Id.* ¶ 37.

Logue did, however, offer Parts Unlimited a year-long 5% discount when it opened a new warehouse in order "to compete aggressively for market share against Metzeler, Michelin and Bridgestone." Pl.'s Repl.Mem. Supp.Mot.Part.Summ.Judg. at 4 n. 5. This is the sole instance in which Logue refers to specific competitors as the impetus for offering a discount on Dunlop tires. In the case of Motorcycle Stuff, Logue states that he "was not generally provided specific prices of competitors or various other details about ... their discounts, despite my asking and re-asking about them." *Id.* ¶ 49. In one instance, Logue granted Motorcycle Stuff a discount in July 1991, but "cannot now remember whether Mr. Dodd mentioned any specific competitors whose competition he was asking Dunlop to meet." Pl.'s Repl.

Mem.Supp.Mot.Part.Summ.Judg. at 3 n. 4. Logue admits that there was one instance in which he met a price of $30 offered by a competitor to Motorcycle Stuff, as opposed to a discount. App. to Def.'s Rule 12(N) Resp., Tab 15, at 1297. There is no other testimony where the specific level of Dunlop's competitor's discount was revealed or discussed. Furthermore, according to Logue, at no time did any of these three distributors threaten to terminate their business with Dunlop, but all three indicated that Dunlop's failure to provide additional discounts could result in a loss of sales of Dunlop tires through those distributors. *Id.* ¶¶ 26, 39, 51.

Dunlop also provides deposition testimony by Robert Nickell and Jeffrey Fox. Robert Nickell refers to "discussions [with Logue] to do with the fact that we were getting volume incentives from other tire manufacturers ... I would have been negotiating to try to get similar type incentives or volume programs from Dunlop." App. to Def.'s Rule 12(N) Resp., Tab 7, at 413. He does not recall any specific occasions, however, on which Logue requested or received any documentation of the competing offers. *Id.* Similarly, Jeffrey Fox states that he and Logue discussed "on a continuous basis ... what the water level is in this industry," but is unable to recall specific conversations or details. App. to Def.'s Rule 12(N) Resp., Tab 5, at 164. He does not refer to any instances in which he provided Logue with specific information about discounts from competitors. *See id.*

### b. Analysis

■ Under the first prong of the *Falls City* test, Dunlop does not necessarily need to know the specific price offered by the competitor, but it must produce facts sufficient to enable a jury to determine the range of discount(s) offered by Dunlop's competitors, so that they can compare the discounts Dunlop offered to Tucker/Rocky and Parts Unlimited (but not Nichols) to "meet competition." Tucker/Rocky and Parts Unlimited would then need to testify at trial that they reported such a range of discounts. None of

the defendants have offered that testimony; in fact, it is conspicuously absent. Failure to satisfy this element of the section 2(a) defense requires summary judgment in Nichols' favor.

Instead of concentrating on the objective requirements of a section 2(a) defense, both parties have focused on whether Dunlop demonstrated good faith in responding to a competitor's lower price, invoking the four *Gypsum* factors.[42] Dunlop relies on a number of cases in which courts have applied *Gypsum's* extremely flexible standard. *See, e.g., Falls City*, 460 U.S. at 439, 103 S.Ct. at 1291 ("In most situations, a showing of facts giving rise to a reasonable belief that equally low prices were available to the favored purchaser from a competitor will be sufficient to establish that the seller's lower price was offered in good faith to meet that price."); *Great Atl. & Pac. Tea Co. v. FTC*, 440 U.S. 69, 99 S.Ct. 925, 59 L.Ed.2d 153 (1979) (holding that the defendant had successfully demonstrated good faith where the defendant had a long-standing business relationship with the customer and faced a credible threat of losing its account with the customer unless it made substantial concessions); *Reserve Supply*, 971 F.2d 37 (affirming district court's grant of summary judgment to the defendant manufacturer on the issue of good faith even though the ultimate discount did not meet, but rather beat, the competition, where the manufacturer had presented evidence of its long-term relationship with the customer, whom it believed to be trustworthy, and other customers had reported precisely the same discount from the manufacturer's competitor); *Cadigan v. Texaco, Inc.*, 492 F.2d 383 (9th Cir.1974) (affirming summary judgment in favor of the defendant where the defendant relied on the buyer's uncorroborated reports that the defendant's competitors offered greater discounts and threatened to terminate business with the defendant if it failed to grant additional discounts); *Jones v. Borden Co.*, 430 F.2d 568 (5th Cir.1970) (holding that a good faith defense was properly asserted where several buyers informed the manufacturer that the

---

**42.** Note that the "good faith" response is only one part of the test. The other part of the test regards the objective and verifiable evidence

used by the manufacturer to come up with or calculate a discount level or range that would *meet* competition.

manufacturer's price was uncompetitive and the manufacturer suffered substantial loss of sales prior to granting an additional discount); *Forster Mfg. Co. v. FTC*, 335 F.2d 47 (1st Cir.1964) (noting that good faith defense does not require that the defendant know the identity of his competitor or have concrete proof of the amount of the competitive offer), *cert. denied*, 380 U.S. 906, 85 S.Ct. 887, 13 L.Ed.2d 794 (1965); *McCaskill v. Texaco, Inc.*, 351 F.Supp. 1332 (S.D.Ala.1972) (granting summary judgment to the defendant where customers provided the defendant with uncorroborated reports of greater discounts from the defendant's competitors), *aff'd*, 486 F.2d 1400 (5th Cir.1973); *Krieger v. Texaco, Inc.*, 373 F.Supp. 108 (W.D.N.Y. 1972) (granting summary judgment to the defendant where a long-standing customer informed the defendant of competing offers and partially terminated business with the defendant until the defendant lowered its prices).

On the issue of good faith alone, Dunlop has relied heavily on Logue's subjective determinations, which were based on his business experience. Pat Logue testified at his deposition that Tucker/Rocky, Parts Unlimited and Motorcycle Stuff all informed him that Dunlop's discounts were uncompetitive and that Dunlop would lose sales as a result. Dunlop had long-standing business relationships with each of these distributors and believed them to be trustworthy. In addition, Logue states that it was his practice to request from the distributors documentation of these competing offers, even though such information was rarely, if ever, forthcoming. Logue also states that it was his practice to refer to the competitors' published price lists, if available to Dunlop, in order to confirm that the reported offers which no one now recalls were indeed in line with current market conditions. This evidence may have been sufficient to present a genuine issue of fact as to Dunlop's good faith under *Gypsum's* lenient standards for good faith, as applied by the Seventh Circuit in *Reserve Supply*, if other non-subjective facts about actual price ranges from competitors had been established.

The key issue in this case is whether Dunlop has successfully shown "the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor," a necessary element to asserting a section 2(b) affirmative defense. *Staley*, 324 U.S. at 759–60, 65 S.Ct. at 977. Nichols touches upon this issue tangentially in its assertion that Dunlop had no procedures in place for verifying the existence of any alleged equally low price of a competitor. *See* Pl.'s Mem.Supp.Mot.Part. Summ.Judg. at 12–15. Dunlop, however, is unable to point to facts that would lead a reasonable and prudent person to believe that Dunlop was meeting the equally low price of a competitor and has not provided sufficient evidence that it was ever apprised or aware of what its competitors' prices or price levels were, as compared with Dunlop's prices. Furthermore, Dunlop, through the deposition testimony of Logue, Nickell and Jeffrey Fox, is unable to show that Logue (*i.e.*, Dunlop) ever knew, or even believed that he knew, the amount of the discounts offered by Dunlop's competitors. Absent such information, Dunlop had no way to determine that the lower price it granted to distributors who informed Logue that they were receiving discounts from competing manufacturers was "meeting" the equally low price of a competitor.

In each of the cases cited by Dunlop, the defendant had some knowledge of the nature of the offer presented by its competitor upon which to base its counter-offer. *See Great Atl. & Pac. Tea Co.*, 440 U.S. at 84, 99 S.Ct. at 934 (noting that customer told the defendant that a $50,000 improvement in its bid "would not be a drop in the bucket"); *Reserve Supply*, 971 F.2d at 43 (noting that manufacturer's representative had contemporaneous notes of his conversation with customer indicating the *exact amount* of the competitor's discount); *Cadigan*, 492 F.2d at 385–86 (stating that buyer told defendant the *exact amount* of the discounts offered by defendant's competitors); *Jones*, 430 F.2d at 573 (noting that buyer told defendant that defendant's *price was "generally five percent higher"* than competitor's); *Forster*, 335 F.2d at 54 (stating that several buyers informed

the defendant of the *exact nature of the competitive offer,* and the defendant conducted an independent investigation in order to confirm the offer); *McCaskill,* 351 F.Supp. at 1337–38 (stating that buyers told defendant the *exact amount of the discounts offered* by defendant's competitors); *Krieger,* 373 F.Supp. at 112 (noting that buyer told defendant the prices offered by defendant's competitors).

In addition, in *Glowacki v. Borden,* 420 F.Supp. 348 (N.D.Ill.1976), a case we find analogous to the instant situation, Judge Grady denied the defendant's motion for summary judgment where the seller informed the defendant distributor that the defendants' prices were higher than those of a competitor, but the defendant failed to assert facts demonstrating that it had reason to believe that the prices it offered in response were no lower than those offered by its competitor. In this case, Dunlop offers no evidence that it was ever aware of even the approximate amount of the discounts offered by its competitors. Logue can recall no specific instance in which a distributor informed him of an exact amount of a competitor's discount, or even provided some sort of benchmark by which Logue could set a competitive discount on Dunlop tires. The competitors' price lists to which Logue referred were often outdated and did not include unofficial discounts, which were frequently offered by tire manufacturers such as Dunlop and its competitors.

Dunlop therefore has failed to demonstrate "the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor," *Falls City,* 460 U.S. at 438, 103 S.Ct. at 1290 (citations omitted). Because "the seller must show that under the circumstances it was reasonable to believe that the quoted price or a lower one was available to the favored purchaser or purchasers from the seller's competitors," *id.* (quoting *Gypsum,* 438 U.S. at 451, 98 S.Ct. at 2880), to prevail, Dunlop has failed to produce sufficient factual support for the assertion of a section 2(b) defense, and has therefore failed to carry its burden on Nichols' Motion for Partial Summary Judgment. It's motion on the section 2(b) defense is, therefore, granted.

## III. The State Law Claims

### A. The Facts

The following facts undisputed facts relate to the state law claims alleged in plaintiff's Third Amended Complaint. In September 1992, Pat Logue, from Dunlop, told Ken Anderson, from Nichols, that the "prices" Nichols received from Dunlop were the same as those offered to other Dunlop distributors; that "there were no other prices." 12(N)(3)(b) Reply ¶ 63. Logue also told Terry Baisley, from Nichols, that all distributors bought from the same price sheet. *Id.* In addition, there is no dispute that sometime in 1992 Logue told Nichols that it would not be terminated as a distributor. 12(N)(3)(b) ¶ 64. At that time, Nichols operated as a Dunlop distributor under the 1992 Distributor Agreement, which ended December 31, 1992. *Id.* On December 28, 1992, Dunlop issued a Memorandum informing all of its distributors that it intended to terminate two or three of them in 1993. PX 16. Dunlop mailed a copy of this Memo with the 1993 Distributor Agreements to each of its distributors. Nichols received a copy of the Memo and the Agreement, which it signed on January 11, 1993. The 1993 Distributor Agreement contained a "termination" provision which provided that Dunlop had the option to terminate the agreement with five days notice. PX 1.

In addition to Dunlop's alleged misrepresentations, Nichols bases some of its state law claims upon its decision to open a second warehouse. Nichols began exploring the possibility of opening a second warehouse in Phoenix, Arizona, in March 1992. 12(N)(3)(b) ¶ 66. Nichols leased the warehouse in September 1992. *Id.* Nichols admits that Dunlop never asked for the Phoenix warehouse, nor did it require Nichols to obtain the warehouse as a condition of its right to distribute Dunlop tires under the relevant agreements. 12(M) ¶ 419. The record also reflects that Nichols attempted to conceal its Phoenix plans. For instance, in September 1992, two days after Nichols leased the warehouse, Jack Jesse testified that in Las Vegas "we kind of told him

[Logue] with our laughter and humor" that Nichols was opening a Phoenix warehouse. 12(N)(3)(b) ¶ 66. Nichols began to stock Dunlop tires in its Phoenix warehouse before it opened on January 14, 1993. *Id.* Dunlop attended the opening of the warehouse and agreed to ship Dunlop products there. *Id.* There is no evidence that Dunlop knew that Nichols had invested in the warehouse until it received Nichols' first purchase order. *Id.* The warehouse currently remains open. 12(N)(3)(b) ¶ 67.

### B. Claims Against Dunlop

### 1. Count VIII: Illinois Consumer Fraud Act

In Count VIII, plaintiff alleges that Dunlop intentionally misrepresented that: (1) Nichols received the same prices and discounts offered to the other distributors; and (2) Nichols would not be terminated as a Dunlop distributor, in violation of the Illinois Consumer Fraud Act ("Consumer Fraud Act" or "the Act"). 815 ILCS 505/1 *et seq.* Compl. ¶ 63.

> Section 2 of the Act provides:
> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act,' approved August 5, 1965, in the conduct of any trade or commerce hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

815 ILCS 505/2.

Dunlop contends that Nichols is not a "consumer" under the Act and therefore lacks standing to bring this claim. In particular, Dunlop contends that the claim is defective because it does not involve Illinois trade or commerce or affect Illinois consumers. Nichols fails to specify allege an affect on trade or commerce in Illinois.

There is currently a split among both Illinois and federal district courts as to whether an effect upon Illinois consumers is required to properly bring a claim under the Act. 815 ILCS 505/2.

Section 815 ILCS 505/1(f) defines trade or commerce as:

> the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated, *and shall include any trade or commerce directly or indirectly affecting the people of this State.* (emphasis added).

Some Illinois courts find that the Act is intended to "protect and benefit Illinois residents," *Lincoln Nat'l Life Ins. Co. v. Silver,* 1991 U.S.Dist. LEXIS 13857 at *34–35 (N.D.Ill. October 1, 1991). These courts construe the language "shall include any trade or commerce" to limit the reach of the Act's protection. *See Swartz v. Schaub,* 818 F.Supp. 1214 (N.D.Ill.1993) (Shadur, J.) (citing *Seaboard Seed Co. v. Bemis Co., Inc.,* 632 F.Supp. 1133 (N.D.Ill.1986) (Shadur, J.)). *See also Cange v. Stotler & Co.,* 913 F.2d 1204, 1210 (7th Cir.1990) (Act outlaws unfair methods of competition in the conduct of any trade or commerce which directly or indirectly affects the people of Illinois). For practical purposes, the holdings in these cases mean that a valid Consumer Fraud Act claim must include allegations of trade or commerce directly or indirectly affecting consumers in Illinois.

Conversely, some courts construe the language of the Act broadly and hold that the Act was not strictly intended to protect only Illinois consumers, but also to prohibit fraud in the conduct of *any* trade or commerce. *See Cirone–Shadow v. Union Nissan of Waukegan,* No. 94 C 6723, 1995 WL 238680, *3 (N.D.Ill. April 20, 1995) (Kocoras, J.) (holding that the statute, by its terms, does not limit its scope to the protection of Illinois residents); *Fry v. UAL Corp.,* 136 F.R.D. 626 (N.D.Ill.1991) (Holderman, J.) (same); *CPS Corp. v. Tkalitch,* 1994 WL 724834

(N.D.Ill. Dec. 22, 1994) (Pallmeyer, J.). *Duhl v. Nash Realty Inc.*, 102 Ill.App.3d 483, 495, 57 Ill.Dec. 904, 429 N.E.2d 1267 (1981) (legislature clearly mandated that Illinois courts should liberally construe and broadly apply the Consumer fraud Act in order to eradicate all forms of deceptive and unfair business practices).

In the absence of a ruling by the Illinois Supreme Court on this issue, this Court must determine which construction of the Act to apply. This Court believes that the Illinois Consumer Fraud Act, although intended to protect Illinois consumers, does not contain a geographic limitation. The Court also believes that the Illinois Supreme Court would construe the Act liberally to include all consumers whose allegations of fraud directly or indirectly affect trade or commerce in Illinois. The Seventh Circuit has held that if the Illinois Supreme Court were to face the question whether the Act requires injury to a particular consumer, or consumers generally, the Court would require a showing that a defendant's misconduct injured consumers generally." *First Comics, Inc. v. World Color Press, Inc.*, 884 F.2d 1033, 1040 (7th Cir. 1989) (cited by *Cange*, 913 F.2d at 1210). Thus, both the definition of a consumer and the affect upon that consumer sweeps broadly and includes Nichols' general allegations of injury. Nichols is not only an Illinois corporation, but it does business in Illinois. Therefore, any injury to Nichols is either an injury or the functional equivalent of an injury to an Illinois consumer. Nichols therefore has standing to assert Count VIII.

■ The next question is whether a genuine issue of triable fact exists on the issues of price discrimination and termination. To establish a claim under the Act, a plaintiff must allege and prove the following elements: (1) the misrepresentation or concealment of a material fact; (2) an intent by the defendant that the plaintiff rely on the misrepresentation or concealment; and (3) that the deception occurred in the course of conduct of any trade or commerce. *Celex*, 877 F.Supp. at 1128; *Siegel*, 153 Ill.2d at 542, 180 Ill.Dec. 300, 607 N.E.2d 194. In 1994, the Illinois Supreme Court also recognized that a plaintiff must show that the challenged conduct of the defendant proximately caused the damages alleged under the Act. *See Martin v. Heinold Commodities, Inc.*, 163 Ill.2d 33, 58–59, 205 Ill.Dec. 443, 455–56, 643 N.E.2d 734, 746–47 (1994) (citing cases); 815 ILCS 505/2.

■ Nichols claims that Dunlop made two misrepresentations: First, sometime in 1992, Dunlop promised not to terminate Nichols (termination claim). Second, in September 1992, Pat Logue told Ken Anderson that Nichols was receiving Dunlop's best distributor prices and discounts on tires.

■ It is undisputed that Logue's statement about price was false (price discrimination claim). Therefore, the element of misrepresentation has been established. The question on price is whether this misrepresentation was material, and whether Dunlop intended for Nichols to rely on the misrepresentation. *See Ryan v. Wersi Elec. GmbH & Co.*, 59 F.3d 52 (7th Cir.1995). With respect to materiality, there are genuine issues of material fact. A misrepresentation is material if the party to whom it was made would have acted differently had the party known the truth. *Id.* at 54. The determination of whether a misrepresentation is material involves factual determinations generally inappropriate for resolution on a summary judgment motion. *Foster v. Zeeko*, 540 F.2d 1310, 1319 (7th Cir.1976). Similarly, questions of intent are inappropriate for summary judgment. *Celex Group Inc. v. Executive Gallery, Inc.*, 877 F.Supp. 1114, 1128 (N.D.Ill.1995). In this case, the Court is unable to find, as a matter of law, that Nichols would not have brought this lawsuit sooner than it did had it known that Tucker/Rocky and Parts Unlimited were receiving discounts it did not receive. Moreover, genuine issues of fact regarding injury from price discrimination exist in this case which would preclude summary judgment on Count VIII.

With respect to termination, there are similar questions. The difference between the termination claim for fraud under the Act, and the claim alleged under common law, is that under common law reliance is an element; under the Act it is not. *Celex*, 877

F.Supp. at 1128 (citing *Siegel v. Levy Organization Dev. Co.*, 153 Ill.2d 534, 542, 180 Ill.Dec. 300, 607 N.E.2d 194 (1992)). Whereas the Court can confidently say that Nichols could not reasonably rely, as a matter of law, on any promises not to terminate after January 11, 1993 (the date it signed the 1993 Distributor Agreement), we cannot say that Dunlop did not manifest an intent to deceive Nichols in 1992 when it made the alleged statements, nor can the Court say that these statements were not material misrepresentations, as those terms have been defined. *Ryan, supra at 54.* We therefore deny summary judgment, under both the theory of price and termination, on Count VIII.

**2. Counts IX & X: Illinois Franchise Act**

■ The key issue involved in resolving Counts IX and X is whether Nichols is a franchise under the Illinois Franchise Disclosure Act. 815 ILCS 705/3(1) (1995) ("Franchise Act"). Whether Nichols has standing to bring a suit under the Franchise Act depends upon whether it satisfies the definition of a franchise.

A franchise is defined as a contract granting the right to engage in business and requiring the payment of a "franchise fee." 815 ILCS 705/3(1). A franchise fee is any fee or charge (including payment for goods or services) that is required by the franchisor for the right to sell, resell, or distribute goods or services, and is paid directly or indirectly by the franchisee. 815 ILCS 705/3(14).

■ A "franchise" thus requires a contract and a required fee. Nichols' contract with Dunlop did not characterize their relationship as a "franchise" nor did it require payment of a fee. 12(M) ¶ 443 (the agreement did not require payment of a "franchise fee," "service fee," or "royalty fee"). Under Illinois law, a payment is not a "franchise fee," unless it fits precisely within the statutory definition. *See Account Services Corp. v. DAKCS Software Services, Inc.*, 208 Ill. App.3d 392, 153 Ill.Dec. 423, 427, 567 N.E.2d 381, 385 (1990). Nichols contends, however, that its maintenance of large inventories, its processing of customer returns, and its provision of its own products liability insurance (at Dunlop's request) operates as a franchise fee. This argument, however, is flawed because all the payments Nichols made to Dunlop pursuant to its distributorship agreement were *voluntary.* 12(M) ¶ 443. Nichols was not required by Dunlop to maintain large inventories, nor can Dunlop's discount system be considered a "de facto" inventory requirement since Nichols admits it was able to sell off the inventory within six months without special promotions or discounts. Costs stemming from processing customer returns are simply costs associated with doing business and are, therefore, not a franchise fee. *See Bryant Corp. v. Outboard Marine Corp.*, 1994 WL 745159 at *3 (W.D.Wash. Sept. 29, 1994) (providing warranty administration work for the suppliers products does not constitute a franchise fee). Finally, Dunlop's request that Nichols provide products liability insurance is just that, a request, and not a requirement.

For these reasons, the Court finds that Nichols never paid a franchise fee to Dunlop and therefore has no standing to sue under the Act as "franchise." Summary judgment is therefore granted in favor of Dunlop as to Counts IX and X.

**3. Count XI: Promissory Estoppel**

■ The 1993 Distributorship Agreement signed by Nichols contained a clause which allowed Dunlop to terminate their relationship at any time, as long as Nichols was provided with five days notice. In Count XI, Nichols argues that, in spite of this provision, it reasonably and foreseeably relied upon Dunlop's promise, made in 1992, not to terminate Nichols as a Dunlop distributor. Nichols contends that this promise modified the contract and that Dunlop should be estopped from exercising the termination provision.

■ In Illinois, the elements necessary to establish a claim of promissory estoppel are: (1) an unambiguous promise; (2) on which the promisee reasonably and justifiably relied; (3) which was foreseeable by the promisor; and (4) on which the promisee relied to his detriment. *See M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1408 (7th Cir. 1991). New York law, which applies to the

contract claims in this case, applies the same elements. *Gellerman v. Oleet*, 164 Misc.2d 715, 625 N.Y.S.2d 831, 832 (1995) (citing *James King & Son, Inc. v. De Santis Constr.*, 97 Misc.2d 1063, 413 N.Y.S.2d 78, 81 (1977)).

Even if this Court were to accept Nichols' claim that Dunlop's oral promises modified the written distributor contract, Nichols' promissory estoppel claim must fail. Sometime in 1993, Logue promised Nichols that their relationship would not be terminated. At most, this promise could affect only the 1992 Distributor Agreement. In January 1993, Nichols signed a new Distributor Agreement. This agreement contained the termination clause with no mention of the oral promises. It also contained an integration clause. The 1993 contract supersedes the 1992 contract, whether the 1992 contract was modified or not. Further, there is no indication that the 1993 contract was similarly modified. Therefore, if Nichols' reliance on Dunlop's promises was actionable at all under the doctrine of promissory estoppel, it was actionable only under the 1992 contract. Dunlop terminated Nichols in 1993 pursuant to their 1993 agreement. Plaintiff's promissory estoppel claim must fail and summary judgment is granted for Dunlop on Count XI.

**4. Count XII: Equitable Estoppel**

Nichols also claims that Dunlop is equitably estopped from exercising its right to terminate Nichols under the terms of the 1993 contract because Dunlop made material misrepresentations with respect to price and termination. Unlike promissory estoppel, the doctrine of equitable estoppel is based upon an intended misrepresentation or the concealment of a material fact rather than a promise. *Derby Meadows Util. v. Inter–Continental*, 202 Ill.App.3d 345, 147 Ill.Dec. 646, 655, 559 N.E.2d 986, 995 (1990). The elements necessary to assert a claim for equitable estoppel are: (1) words or conduct consisting of misrepresentations or concealment of material facts; (2) defendant must have actual or implied knowledge at the time the representations are made that they are untrue; (3) plaintiff does not know that the representations are untrue at the time that they are made; (4) the party estopped must intend or expect that his conduct or representations will be acted on by the plaintiff; (5) plaintiff relies on the representations in such a manner that he would be prejudiced if the party making the representations is allowed to deny the truth thereof. *See Derby Meadows Util.*, 147 Ill.Dec. at 655, 559 N.E.2d at 995.

Nichols' equitable estoppel claim fails because Nichols cannot prove, as a matter of law, that it relied on Dunlop's 1992 statement that Nichols would not be terminated. Nichols cannot prove reasonable reliance because it read the December 28, 1992, Memorandum from Dunlop announcing the imminent termination of two or three distributors and signed the 1993 Distributorship Agreement which contained an express at will provision and an integration clause. Nichols also cannot prove reliance, as a matter of law, after it signed the 1993 contract because Dunlop made no additional assurances to Nichols regarding termination after January 11, 1993. The Court therefore grants summary judgment in favor of Dunlop on Count XII.

**5. Count XIII: Equitable Recoupment**

The equitable recoupment doctrine applies when a contract is terminated without just cause before the terminated party has the opportunity to recoup its losses. *Cox v. Doctor's Associates, Inc.*, 245 Ill. App.3d 186, 200, 184 Ill.Dec. 714, 613 N.E.2d 1306 (1993). The doctrine "is designed to remedy the inequity which arises after a manufacturer requires a distributor to make a sizable investment in furtherance of the distributorship, terminates the relationship without just cause and leaves the distributor with substantial unrecovered expenses." *Id.* at 200, 184 Ill.Dec. 714, 613 N.E.2d 1306. In some courts, the doctrine is cognizable only after it is shown that the contract in question is terminable at will. *Ag–Chem Equip. Co. v. Hahn, Inc.*, 480 F.2d 482 (8th Cir.1973).

Nichols alleges that it made sizable investments, including leasing, improving and stocking the Phoenix warehouse to promote Dunlop goods in reliance on Dunlop's assurances that it would not be terminated.

Compl. ¶ 81. Nichols also claims that Dunlop terminated its agreement with Nichols without just cause, leaving Nichols with substantial unrecouped investments. Compl. ¶ 82.

Nichols equitable recoupment claim fails because there is no evidence that Dunlop "required" Nichols to establish a business in Phoenix. Rather, Nichols contends that Dunlop merely "encouraged" such action. Compl. ¶ 15. Hence, Dunlop is not responsible for Nichols investments due to its termination as a Dunlop distributor, since Dunlop did not require Nichols to make such investments. Dunlop's Motion for Summary Judgment with respect to Count XIII is, therefore, granted.

### 6. Count XIV: Breach of Contract/Good Faith & Fair Dealing

■ Both Illinois and New York courts have declared that every contract implies good faith and fair dealing between its parties. *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2nd Cir.1992); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir.1992). However, the covenant is not an independent source of contractual duties; rather, it "guides the construction of explicit terms in the agreement." *Beraha*, 956 F.2d at 1443. When a term in the contract grants a wide range of discretion, the party must "exercise that discretion reasonably, with proper motive and in a manner *consistent with the reasonable expectations of the parties.*" *Id.* at 1444 (citing *Dayan v. McDonald's Corp.*, 125 Ill.App.3d 972, 81 Ill.Dec. 156, 170, 466 N.E.2d 958, 972 (1984) (emphasis in original).

■ On its face, this covenant appears to be at odds with the concept of at will contracts, which allow a party to exercise its discretion to terminate a contractual relationship for virtually any reason. However, since an at will contract expressly allows each party to terminate at any time, the parties have no reasonable expectation that it will be terminated only for cause. *Beraha*, 956 F.2d at 1444–1445. Therefore, the covenant is not breached when one party terminates an at will contract because the party's actions were in accord with the other's reasonable expectations. *Id.*

■ In this case, the 1993 contract entered into between Nichols and Dunlop stated: "In addition to the termination rights in paragraph 2, this agreement may be terminated with or without cause by either party upon five days' written notice addressed to the other party by mail or wire." 12(M) ¶ 407. Nichols claims that Dunlop breached the implied duty of good faith and fair dealing when it terminated Nichols because it exercised the discretion provided by this clause in bad faith. However, since the contract expressly provided that Dunlop could terminate its distributor relationship with Nichols for any reason, Nichols could not have had a reasonable expectation that Dunlop would only terminate it for cause. Nichols' claim for breach of the implied covenant of good faith and fair dealing fails because Nichols does not allege that Dunlop exercised its discretion in any manner inconsistent with the reasonable expectations of the parties. Therefore, Dunlop's motion for summary judgment of Count XIV is granted.

### 7. Count XV: Fraud

■ The elements of a cause of action for common law fraudulent misrepresentation are: (1) false statement of material fact; (2) known or believed to be false by the party stating it; (3) intent to induce the other party to act; (4) justifiable reliance by the other party on the misrepresentation; and (5) damage to the other party resulting from such reliance. *Heider v. Leewards Creative Crafts, Inc.*, 245 Ill.App.3d 258, 184 Ill.Dec. 488, 494, 613 N.E.2d 805, 811 (1993) (citing *Soules v. General Motors Corp.*, 79 Ill.2d 282, 37 Ill.Dec. 597, 599, 402 N.E.2d 599, 601 (1980)). Nichols bases its fraud claim against Dunlop upon two alleged misrepresentations. First, Nichols points to Logue's statement, made in 1992, that Nichols would not be considered for termination as a distributor. Second, Nichols alleges that Dunlop falsely represented that Nichols was getting the same discounts from Dunlop that other distributors were receiving.

With respect to Logue's 1992 statement regarding the possibility that Nichols would

be terminated as a distributor, the Court has already determined that the statement was superseded by the 1993 contract. After Nichols signed this contract on January 11, 1993, Nichols reliance on Logue's statement was unjustified. *See Merex A.G. v. Fairchild Weston Systems, Inc.*, 810 F.Supp. 1356, 1372 (S.D.N.Y.1993) (no justified reliance when oral promise contradicts an admitted, subsequent written executory agreement). Therefore, Nichols cannot recover for the damages it is seeking that result from events that occurred after the 1993 contract was signed, which primarily arise from the opening of the Phoenix warehouse. During that time, the 1993 contract was controlling.

There is a possibility that Nichols could have been damaged by its reliance on Logue's statement during the time between when the statement was made and when Nichols signed the 1993 contract. The reasonableness of a party's reliance, however, is determined at the time that the party acts upon the misrepresentation. *Duran v. Leslie Oldsmobile Inc.*, 229 Ill.App.3d 1032, 171 Ill.Dec. 835, 843, 594 N.E.2d 1355, 1363 (1992). A plaintiff's subsequent opportunity to become informed of the true facts contradicting a misrepresentation cannot render prior reliance unreasonable. *Id.* Thus, Nichols still must prove that its reliance during this time was reasonable.

Dunlop asserts that Nichols cannot prove that its reliance upon Logue's statements was reasonable because it was a promise of future conduct. As a general rule, promises of future conduct are not actionable in fraud. *Wilsmann v. Stearns*, 664 F.Supp. 386, 391 (N.D.Ill.1987) (citing *Steinberg v. Chicago Medical School*, 69 Ill.2d 320, 13 Ill.Dec. 699, 706, 371 N.E.2d 634, 641 (1977)). However, an exception to this rule exists when the false representation is part of a "scheme or device" used to accomplish the fraud. *Wilsmann*, 664 F.Supp. at 391. Nichols has alleged that the promise was part of a scheme. Whether or not a scheme actually existed in this case is a question of fact for the jury. *See Stamatakis Indus., Inc. v. King*, 165 Ill.App.3d 879, 117 Ill.Dec. 419, 520 N.E.2d 770 (1987).

In addition, Nichols must prove that its reliance upon Dunlop's statements regarding price was reasonable, and that Dunlop intended to deceive Nichols with these statements. This creates genuine issues of material fact that the jury must decide. *See Foster v. Zeeko*, 540 F.2d 1310, 1319 (7th Cir.1976); *Fitzsimmons v. Best*, 528 F.2d 692, 694 (7th Cir.1976); *Fisher v. Samuels*, 691 F.Supp. 63, 69 (N.D.Ill.1988) (questions of reasonableness and intent involve factual determinations and are generally inappropriate for resolution on a motion for summary judgment). There are also genuine issues of material fact with respect to the evidence of damages, as expressed in the portion of this opinion dealing with the Robinson–Patman Act claims. Therefore, this Court will deny Dunlop's motion for summary judgment as to Count XV. However, Nichols' claim for fraud regarding the termination will be limited to the alleged damages which preceded the signing of the 1993 contract.

### C. Claims against Tucker/Rocky and Parts Unlimited

#### 1. Count XVI: Tortious Interference with Contract

The elements that a plaintiff must allege and prove for a valid claim of tortious interference with contract include: (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) that the defendant was aware of the contractual relationship; (3) an intentional and unjustified inducement of a breach of the contract which causes a subsequent breach by the third party; and (4) damages, *A–Abart Elec. Supply Inc. v. Emerson Elec. Co.*, 956 F.2d 1399, 1404 (7th Cir.) (quoting *Mannion v. Stallings & Co.*, 204 Ill.App.3d 179, 149 Ill.Dec. 438, 443, 561 N.E.2d 1134, 1139 (1990)), *cert. denied*, 506 U.S. 867, 113 S.Ct. 194, 121 L.Ed.2d 137 (1992). Nichols claims that Tucker/Rocky and Parts Unlimited unjustifiably induced Dunlop to breach its contract with Nichols.

Generally, if a contract at will is terminated, no breach has occurred. Therefore, most courts do not recognize tortious interference with contract claims that are based upon a contract at will. *See Prudential Ins. Co. of*

*Am. v. Sipula,* 776 F.2d 157, 162 (7th Cir. 1985); *Belden v. InterNorth, Inc.,* 90 Ill. App.3d 547, 45 Ill.Dec. 765, 770, 413 N.E.2d 98, 102 (1980); *Restatement (Second) of Torts* § 768 cmt. i (1977); *cf. Prudential Ins. Co. of Am. v. Van Matre,* 158 Ill.App.3d 298, 110 Ill.Dec. 563, 567, 511 N.E.2d 740, 744 (1987) (at will nature of contract does not relieve alleged tortfeasor of liability). In this case, the Court has already determined that Dunlop's termination of Nichols was not a breach of contract because the contract was terminable at will. Since there was no breach, Nichols' claim must fail.

 In addition, Tucker/Rocky's and Parts Unlimited's actions are protected by the "competitor's privilege." Lawful competition is a justifiable reason for interfering with contractual relations. *See Van Matre,* 110 Ill.Dec. at 567, 511 N.E.2d at 744, *Getschow v. Commonwealth Edison Co.,* 111 Ill. App.3d 522, 67 Ill.Dec. 343, 348, 444 N.E.2d 579, 584 (1982). According to the *Restatement (Second) of Torts:*

> A competitor who intentionally causes a third party not to enter into a contract with another or not to continue a contract terminable at will does not interfere improperly if: (1) the relation concerns a matter involved in the competition between the actor and the other; and (2) the actor does not employ wrongful means; and (3) his action does not create or continue an unlawful restraint on trade; and (4) when a business relationship affords the parties only the hope of benefits, the parties must allow for the rights of others.

*Restatement (Second) of Torts* § 768.[43] We have already determined, in the section of this opinion dealing with Count I, that Tucker/Rocky and Parts Unlimited did not participate in conduct restraining trade. Therefore, these defendants' actions are protected by the competitor's privilege. Consequently, summary judgement is granted for Tuck-

er/Rocky and Parts Unlimited as to Count XVI.

**2. Count XVII: Tortious Interference with Prospective Economic Advantage**

 The elements of a claim for tortious interference with prospective economic advantage are: (1) the plaintiff's reasonable expectation of entering into a valid business relationship; (2) the defendant's purposeful interference and destruction of this legitimate expectancy;[44] and (3) that the defendant's actions caused harm to the plaintiff. *A–Abart Elec. Supply, Inc.,* 956 F.2d at 1404 (quoting *Kurtz v. Illinois Nat'l Bank,* 179 Ill.App.3d 719, 128 Ill.Dec. 562, 567, 534 N.E.2d 1007, 1012 (1989). In cases where:

> [a]n individual with a prospective business relationship has a mere expectancy of future economic gain; a party to a contract has a certain and enforceable expectation of receiving the benefits of the contract. When a business relationship affords the parties no enforceable expectations, but only the hope of … benefits, the parties must allow for the rights of others. They therefore have no cause of action against a bona fide competitor unless the circumstances indicate unfair competition, that is, an unprivileged interference with prospective advantage.

*A–Abart Elec. Supply,* 956 F.2d at 1404–1405 (quoting *Belden Corp. v. InterNorth, Inc.,* 90 Ill.App.3d 547, 45 Ill.Dec. 765, 769, 413 N.E.2d 98, 102 (1980)).

 There is no unfair competition in this case, given the Court's rulings on the antitrust claims. Nichols argues that Tucker/Rocky and Parts Unlimited interfered with its valid expectancies to continue its business dealings with Dunlop; to continue to sell Dunlop tires to its customers; to enter into a distributorship relationship with Metzeler; and, as to only Tucker/Rocky, to continue its relationship with its top salespeople, who were hired away from Tucker/Rocky

---

43. This section of the *Restatement* was adopted by Illinois courts in *Galinski v. Kessler,* 134 Ill. App.3d 602, 89 Ill.Dec. 433, 439, 480 N.E.2d 1176, 1182 (1985).

44. The interference must take the form of unfair competition such as fraud, intimidation, or dis-

paragement. *A–Abart Elec. Supply Inc.,* 956 F.2d at 1404–1405. This standard is more stringent than the one used in tortious interference with contract claims because a party's interest in prospective economic advantage receives less protection than its enforceable contract rights. *Id.*

after Dunlop terminated Nichols. However, Nichols' claim fails because the competitor's privilege applies not only to claims of tortious interference with contract, but also to claims of tortious interference with prospective economic advantage. *Id.* Tucker/Rocky, Parts Unlimited, and Nichols are all players in a very competitive market. The Court has determined that Tucker/Rocky and Parts Unlimited did not employ improper competitive strategies. Therefore, summary judgement is granted in favor of Tucker/Rocky and Parts Unlimited on Count XVII.

## IV. Dunlop's Motion to Strike Nichols' Jury Demand

Given the rulings contained in this opinion, this Court hereby denies defendant Dunlop's Motion to Strike Nichols' jury demand. Dunlop's motion is entirely based on form language which is contained in the distribution agreement which existed between Dunlop and Nichols. This proviso was contained in paragraph two entitled "Terms" and stated as follows:

TERMS: The due date and terms of each shipment are indicated on the invoice and on the monthly statement of account. If the Distributor fails to make payment in accordance therewith, or if there is a change in the Distributor's credit worthiness, Dunlop may modify such due dates and terms, or refuse to make further shipments except for cash and the payment in full or the balance due in the Distributor's account, and if Dunlop so decides in such case, may terminate this Agreement without ADVANCE NOTICE. Distributor agrees to pay to [sic] the collection costs of any obligation due from it to Dunlop including attorney's fees, court costs and collection agency fees. In any dispute arising between Distributor and Dunlop, Distributor hereby waives trial by jury in any action, proceeding, counterclaim, whether at law or equity against Distributor or Dunlop, or in any manner whatsoever connected with this Agreement or the performance by Distributor under this Agreement. In the event that the balance shown owing on the Distributor's Statement of Account with Dunlop remains unpaid, in whole or in part, for 30 days or more after the due date shown on said statement and Dunlop institutes a court collection action against Distributor, Distributor agrees to additionally pay interest to Dunlop from said due date. The interest shall be paid at the maximum legal rate which may be charged by commercial banks in Distributor's jurisdiction on payable-on-demand business loans, equal in amount to the past due sum, made by express contract to borrowers similar to the Distributor.

Based on this language Dunlop asserts that Nichols has waived its fundamental constitutional right to a trial by jury. Although the Seventh Amendment of the United States Constitution guarantees the right to a jury trial in civil cases, this right may be waived. *Stewart v. RCA Corp.*, 790 F.2d 624, 630 (7th Cir.1986); *Bonfield v. AAMCO Transmissions, Inc.*, 717 F.Supp. 589, 594 (N.D.Ill.1989). However, such a waiver must be made knowingly and voluntarily. *In re Reggie Packing Co.*, 671 F.Supp. 571, 573 (N.D.Ill.1987). Indeed, "as the right of jury trial is fundamental, courts indulge in every reasonable presumption against waiver." *Aetna Insurance Co. v. Kennedy*, 301 U.S. 389, 393, 57 S.Ct. 809, 812, 81 L.Ed. 1177 (1937). The factors to consider in determining whether a contractual waiver of the right to jury trial was entered into knowingly and voluntarily include: (1) the parties' negotiations concerning the waiver provision, if any, (2) the conspicuousness of the provision, (3) the relative bargaining power of the parties and (4) whether the waiving party's counsel had an opportunity to review the agreement. *Heller Financial, Inc. v. Finch–Bayless Equip. Co.*, No. 90 C 1672, 1990 WL 77500 (N.D.Ill. May 31, 1990), *reconsideration denied*, 1990 WL 103232 (N.D.Ill. July 17, 1990); *Bonfield*, 717 F.Supp. at 595–96; *In re Reggie*, 671 F.Supp. at 573–74. The Court expressly finds that interpreting this clause to be a waiver of an important constitutional right would be unjust under the circumstances of this case.

First, the Court notes that the claims that will proceed to trial in this case are limited to claims that do not directly arise or have their basis in the Distributor Agreement. Instead,

this case will proceed to trial on Nichols' claims against Dunlop involving violations of the Robinson–Patman Act, the Illinois Consumer Fraud Act and common law fraud. Each of these claims are ultimately based on both statutory and common law and cannot be based on the parties' Distributor Agreement. Thus, despite the somewhat broad wording of the purported jury waiver, the Court finds that this jury waiver should be strictly construed against Dunlop, the drafter of the agreement, and that it does not apply to the claims remaining this case.

Moreover, even if this Court were to find that the alleged jury waiver applies to the claims remaining in this case, this Court would still fail to enforce the waiver because there is no evidence that this alleged waiver was ever the subject of any negotiations between the parties. Given the absence of any evidence of such negotiations this Court finds that the alleged jury waiver was inconspicuous and therefore invalid. *Whirlpool Financial Corp. v. Sevaux,* 866 F.Supp. 1102, 1106 (N.D.Ill.1994); *Heller Financial, Inc. v. Finch–Bayless Equipment Co.,* No. 90 C 1672, 1990 WL 77500 (N.D.Ill. May 31, 1990). Finally, all of the circumstances surrounding the execution of the alleged jury waiver have led the Court to conclude that it was not undertaken in a knowing, voluntary and intelligent manner—elements which are necessary conditions for the waiver of any important constitutional right.

### V. Conclusion

For the reasons given above, the Court directs the Clerk of the Court to enter summary judgment in favor of Dunlop, Tucker/Rocky, and Parts Unlimited and against Nichols on Counts I–VI (1–6) of the Third Amended Complaint. The Court further directs the Clerk to enter judgment in favor of Dunlop and against Nichols on Counts IX through XIV (9–14), and in favor of Tucker/Rocky and Parts Unlimited and against Nichols on Counts VII, XVI, and XVII (7, 16, 17) of the Third Amended Complaint. Finally, the Court directs the Clerk to enter partial summary judgment in favor of Nichols and against Dunlop on Dunlop's section 2(b) affirmative defense to Count VII of the Third Amended Complaint.

The Court denies Dunlop's motion for summary judgment with respect to Counts VII, VIII and XV (7, 8, and 15) of the Third Amended Complaint. The Court also denies Dunlop's Motion to Strike Nichols' jury demand.

### ORDER

This matter is before the Court on defendant Dunlop Tire Corporation's Motion To Vacate And Reconsider Ruling Entering Partial Summary Judgment Against Dunlop On Its Section 2(b) Meeting–Competition Defense To Count VII Of The Third Amended Complaint and the parties' Stipulation for Order of Dismissal With Prejudice filed herein pursuant to the parties' Settlement Agreement.

IT IS HEREBY ORDERED THAT:

Pursuant to the parties' Settlement Agreement and the Stipulation of the parties, those portions of (i) the Court's August 1, 1995 order granting plaintiff's motion for partial summary judgment on Dunlop's Section 2(b) affirmative defense to Count VII of the Third Amended Complaint, and (ii) Section II, C, 3 of the Court's Memorandum Opinion and Order dealing with the Section 2(b) defense (initially filed August 10, 1995, and editorially amended September 6, 1995, including pp. 80–90 and the third sentence of the Conclusion on p. 110 of the August 10, 1995 Memorandum, and pp. 1133–38 and the third sentence of the Conclusion on p. 1147 of the September 6, 1995 Memorandum *), are vacated pending dismissal of this action in its entirety by further agreement of the parties and therefore without the need of the Court to address reconsideration on the merits.

---

* Editor's Note: The September 6, 1995 Memorandum immediately precedes this order. The August 10, 1995 Memorandum, which was subsequently amended on September 6, 1995, is not being published.